**Gail J. McCANCE, Appellee,**

v.

**Jason J. McCANCE, Appellant.**

Superior Court of Pennsylvania.

Argued June 21, 2006.
Filed Sept. 20, 2006.

---

**3.** The Code of Federal Regulations only contains fifty titles.

Joseph M. Kecskemethy, Butler, for appellant.

Karen M. Berg, Butler, for appellee.

BEFORE: BOWES, PANELLA and POPOVICH, JJ.

OPINION BY POPOVICH, J.:

¶ 1 Appellant Jason J. McCance appeals the grant of a protection from abuse (PFA)[1] petition filed by Appellee Gail J. McCance on grounds that: 1) Appellee lacked standing to file the PFA; and 2) the evidence was insufficient to sustain the PFA order. We affirm.

¶ 2 The facts of record establish that, at approximately 8:00 p.m. on the 26th day of July, 2005, Appellee was driving her nephew Zachary McCance home. Preceding the drive, the parties had been embroiled in a custody hearing involving Appellant, his sister-in-law Appellee, his son Zachary and the natural mother (Ms. Kelly Marie Perez).[2] Ms. Perez traveled from Florida for the custodial hearing, stayed with Appellee during this period, and accepted Appellee's offer for a ride to the airport after the hearing in order for her to fly back to Florida. Zachary accompanied Appellee to the airport to see his mother off.

¶ 3 Thereafter, Appellee drove her nephew to the primary custodial parent/Appellant's home.[3] Appellee drove approximately 100 feet past Appellant's home to

---

1. 23 Pa.C.S.A. § 6101 *et seq.*, known as the "Protection From Abuse Act" (hereinafter the "Act").

2. In 2005, Ms. Perez initiated litigation to change Appellant's primary custody of Zachary. Appellee and her husband (Appellant's brother) attempted to intervene in the matter by seeking temporary physical custody of

Zachary on July 19, 2005, but the request was denied by the trial court.

3. At the PFA hearing, testimony revealed that a custodial hearing would be set for a future date to assess the merits of permitting Zachary to live in Florida with his mother.

avoid any confrontation. However, in the process of exiting the street adjacent to Appellant's home, Appellant traversed the 100 to 150 feet to the roadway to confront Appellee. The events that followed were recounted by Appellee thusly:

[As she] started driving out[, ... Appellant] was waiting for [her,] and he obstructed [her] view. He jumped in front of [her] vehicle. Then, as [she] was going, [she] didn't stop. There was a stop sign at the end of the road. [Appellant] jumped off to the side, and he hit [her] car. And he was—on approaching [ ] him, he was holding, flaring his fist at [her], pointing his finger, yelling profanities.

Then, whenever [Appellant] punched the car, [Appellee] stopped the car at that point because Zach at that point had gotten to the bottom of the driveway. [Appellee] was afraid for Zach as well as [her]self [because] [Appellant] hadn't seen him in six weeks, and so [Appellee] was afraid for Zach. [Appellee] got out of the car. [Appellee] told Zachary to remember what [Appellee] said to him. [ ... ] [Appellee] never had any words with [Appellant] at all. [Appellant] was threatening [her], [Appellant stated:] I'm going to get you. [Appellant was] mother f'ing [Appellee].

Then, [Appellee] got in the car. That's when [Appellee] proceeded to go to the police station.

N.T. Final Protection From Abuse Hearing, 8/4/05, at 4–5. Appellant also admitted hitting Appellee's vehicle (causing $1,000 worth of damage) and using profanity during the confrontation. *Id.* at 52–53. Further, in fear for her safety and that of her nephew, Appellee reported the incident to the police, who issued Appellant a citation. *Id.* at 54; *see also Id.* at 22a (Appellee: "[Appellant was t]hreatening me, shaking his fist, his finger. [Appel-

lant] told Zach to get the f—k up in the house right now, showing his anger then.").

¶ 4 At the end of the PFA hearing, the trial court entered an order granting Appellee's petition for a period of six months. A timely appeal was filed, and Appellant thereafter submitted a Pa. R.A.P. 1925(b) statement proffering two issues for our review. The first issue reads: "Whether the trial court erred in denying the motion of the [Appellant], made during the final hearing, to dismiss the Petition for Protection from Abuse based upon [Appellee's] lack of standing to bring the petition." More particularly, Appellant argues:

The Appellee's only relationship to the Appellant is through her marriage to Appellant's brother. The Protection From Abuse Act (23 Pa.C.S.[A.] § 6101 *et[ ][s]eq.)* is designed to promote peace and tranquility of households, and among family members and intimate partners who reside or have resided together. The relationship between the parties in the instant case is not one contemplated by the Act.

Further, any affinity or familial relationship resulting from the Appellee's connection to Appellant's child by marriage[ ] was created wholly by the Appellee, through her ill-advised attempts to intervene in a pending custody dispute. Certainly, our legislature never intended extended relatives to gain standing under the Act solely for their own actions, in creating disputes where no true familial relationship previously existed.

As such[,] the Appellee was without standing to bring a petition under the Act.

Appellant's brief, at 7. We agree with Appellant's interpretation of the purpose sought to be achieved with the Legisla-

ture's promulgation of the Act, but we distance ourselves from his view of the perimeters of the Act.

▮ ¶ 5 "The goal of the Protection from Abuse Act is protection and prevention of further abuse by removing the perpetrator of the abuse from the household and/or from the victim for a period of time." *Viruet v. Cancel,* 727 A.2d 591, 595 (Pa.Super.1999); *see also Commonwealth v. Snell,* 737 A.2d 1232 (Pa.Super.1999) (purpose of the Act is to protect victims of domestic abuse, and it does so through numerous provisions that enable court to respond quickly and flexibly to both early signs and subsequent acts of abuse with issuance of protection orders); *Eichenlaub v. Eichenlaub,* 340 Pa.Super. 552, 490 A.2d 918 (1985) (semble). As for individuals who may seek refuge within the confines of the Act, the statute's protective sphere encompasses, *inter alia,* a "family or household members." In section 6102 of the Act, the term "family or household members" is defined as,

> Spouses or persons who have been spouses, persons living as spouses, parents and children, ***other persons related by*** consanguinity or ***affinity,*** current or former sexual or intimate partners or persons who share biological parenthood.

23 Pa.C.S.A. § 6102 (Supp.2006) (emphasis added). Herein, Appellant and Appellee were not spouses, persons living as spouses, related by consanguinity, current or former sexual or intimate partners or persons who share biological parenthood. Consequently, we are left with the determination of whether the litigants were "persons related by affinity." Unfortunately, the Act does not define "affinity." Therefore, as there is no controlling case law interpreting the term in section 6102, we must decipher the General Assembly's intent with respect to the statute's per-

ceived purpose and the consequences of a particular interpretation. *Krebs v. United Refining Company of Pennsylvania,* 893 A.2d 776 (Pa.Super.2006); *see also Vitac Corp. v. W.C.A.B. (Rozanc),* 578 Pa. 574, 854 A.2d 481 (In ascertaining legislative intent, an appellate court must be guided by the primary purpose of the statute and may consider, among other things, the consequences of a particular interpretation.); *In re Canvass of Absentee Ballots of November 4, 2003 General Election,* 577 Pa. 231, 843 A.2d 1223 (2004) (It is only when the words of a statute are not explicit that a court may resort to other considerations, such as the statute's perceived "purpose," in order to ascertain legislative intent.).

¶ 6 Furthermore, as our review of the Act is one of law, our standard of review is *de novo,* and our scope of review is plenary. *Sternlicht v. Sternlicht,* 583 Pa. 149, 156, 876 A.2d 904, 908 (2005). When construing a statute, we are guided by the principles set forth in the Statutory Construction Act of 1972, 1 Pa.C.S.A. §§ 1501–1991. *See Krebs,* 893 A.2d at 787 (citation omitted). Relevant to our review are the provisions set forth at 1 Pa.C.S.A. § 1921, concerning legislative intent. Section 1921 provides:

(a) The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions.

(b) When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.

(c) When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:

   (1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar objects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

1 Pa.C.S.A. § 1921.

¶ 7 Initially, as already noted, the term "affinity" is not defined in the definitional section of the Act. *See* 23 Pa.C.S.A. § 6102 (**Definitions**) (Supp.2006). And, our review of the "Historical and Statutory Notes" following section 6102 gives no guidance as to the meaning to be assigned "affinity" within the context of the Act. However, in conjunction with the Statutory Construction Act, it is not without precedent to utilize Black's Law Dictionary and other definitional treatises to ascertain the meaning of a term. *See, e.g., Carlacci v. Mazaleski,* 568 Pa. 471, 798 A.2d 186 (2002) (reference to Black's Law Dictionary was made for interpretative purpose, which led to establishment of a right to seek expungement of temporary PFA where PFA proceedings never legally evolved beyond the temporary order stage); *Steele v. Statesman Insurance Company,* 530 Pa. 190, 193, 607 A.2d 742, 743 (1992) (in interpreting meaning of exclusion in insurance contract, Pennsylvania Supreme Court looked to Black's Law Dictionary's definition of *ejusdem generis* (of the same kind or class)); *In re Estate of Zambrano,* 875 A.2d 307, 313 n. 8 (Pa.Super.2005) (semble); *Ardrey Ins. Agency v. Ins. Co. of Decatur,* 441 Pa.Super. 94, 656 A.2d 936, 939 (1995) (court not persuaded by Appellant's reference to definition of "commission" in Black's Law Dictionary and Random House Dictionary to show ambiguity because term was defined in paragraph 4 of the agency agreements); *Laguna v. Erie Ins. Group,* 370 Pa.Super. 308, 536 A.2d 419, 422 (1988) (court did not accept interpretation of "loss" proposed by Appellant, but looked to definition of term in Black's Law Dictionary), *overruled* on other grounds, *Neilson v. Nationwide Ins. Co.,* 738 A.2d 490 (Pa.Super.1999) *(en banc).*

¶ 8 In light of the preceding, the plain meaning of the term "affinity" has been defined as:

2. The relation that one spouse has to the blood relatives of the other spouse; relationship by marriage. 3. Any familial relation resulting from a marriage.

\* \* \* \*

***collateral affinity.*** The relationship of a spouse's relatives to the other spouse's relatives. ● An example is a wife's brother and her husband's sister. [ ... ]

***direct affinity.*** The relationship of a spouse to the other spouse's blood relatives. ● An example is a wife and her husband's sister.

***quasi-affinity.*** *Civil Law.* The affinity existing between two persons, one of whom has been engaged to a relative of the other.

***secondary affinity.*** The relationship of a spouse to the other spouse's marital relatives. ● An example is a wife and her husband's sister-in-law.

Black's Law Dictionary 63–64 (8th ed.2004). *Cf. Sullivan v. DOT, Bureau of Driver Licensing,* 550 Pa. 639, 645–46, 708 A.2d 481, 484 (1998) ("In the context of law making, the plain meaning of the term 'enactment' [pursuant to Article VIII(1) of the Compact between states to exchange vehicular citations] is 'the method or pro-

cess by which a bill in the Legislature becomes a law.' BLACK'S LAW DICTIONARY 526 (6th ed.1990)."). In like fashion, Webster's Third New International Dictionary 35 (1971) defines "affinity" as: "bordering on, related by marriage [ ... ] 1: relationship by marriage (as between a husband and his wife's blood relatives)—distinguished from *consanguinity* (his kinsman, by blood[ ... ]); *broadly:* any familial relationship [ ... ]."

¶ 9 In today's world of split families burgeoning beyond the confines of local, county, and state lines, and the affect a child or children of these dispersed multi-family units have on the dynamics of a family environment, it is not without precedent that in-laws become embroiled in custodial disputes, as was the case here. These are individuals who are related by marriage to the litigants, and they invariable take sides and engender a flood of animosity from the opposing parent necessitating a pacifying agent, which in this case was the PFA court to enjoin contact between the parties. To preclude Appellee from seeking the protection of the Act would be to ignore reality: The natural parent (Appellant) and the in-law (Appellee) are inextricably intertwined with the child, and neither party appears willing to disassociate themselves from interacting with the child or the family unit. Therefore, a remedial mechanism in the form of a PFA order is the appropriate vehicle to keep the parties civil one toward the other.

¶ 10 We take all of the aforementioned into account in seeking to give meaning to all the terms in the PFA statute, preserve its objective, and, in the process, avoid the production of an absurd result. *See* 1 Pa.C.S.A. § 1921. Toward that end, we interpret "affinity" in the Act to include a family relationship of brother-in-law (Appellant) and sister-in-law (Appellee). Such an interpretation does not do violence to the purpose of the Act, which is to forestall escalation of disputes among family members where injury may be on the horizon. *See Mahorsky v. Mahorsky,* 22 D. & C.3d 210, 213 (1982) ("The entire thrust of the [Protection from Abuse A]ct and rules of civil procedure is to create an efficient, simple and rapid vehicle for the resolution of family disputes."); *contrast Olivieri v. Olivieri,* 451 Pa.Super. 50, 678 A.2d 393 (1996) (PFA was not a vehicle to resolve dispute between sister and brother feuding as partners about the way the business was being operated).

■ ¶ 11 Next, we turn to Appellant's second issue, which challenges the sufficiency of the evidence to sustain the issuance of the PFA order.

■ ¶ 12 "When a claim is presented on appeal that the evidence was not sufficient to support an order of protection from abuse, we review the evidence in the light most favorable to the petitioner and granting her the benefit of all reasonable inference, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence." *Miller on Behalf of Walker v. Walker,* 445 Pa.Super. 537, 665 A.2d 1252, 1255 (1995). *See* 23 Pa.C.S.A. § 6107(a) ("the plaintiff must prove the allegation of abuse by a preponderance of the evidence"). This court defers to the credibility determinations of the trial court as to witnesses who appeared before it. *Alfred v. Braxton,* 442 Pa.Super. 381, 659 A.2d 1040, 1043 (1995). Having determined our standard of review, we analyze whether the evidence in the present case was sufficient, which we find it was and adopt the trial court's opinion on the subject; to-wit:

Abuse as defined by 23 Pa.C.S.A. § 6102(2) is "Placing another in reasonable fear of imminent serious bodily injury." In the case at bar, the record will show that Plaintiff/Appellee has ade-

quately demonstrated that she had a reasonable fear of imminent serious bodily injury for her person. *Ferri v. Ferri* dictates that "actually physical injury is not required for the entry of a final order but reasonable fear of imminent bodily injury must be demonstrated." *See Ferri v. Ferri,* 854 A.2d 600 (Pa.Super.2004). Plaintiff/Appellee testified that Defendant/Appellant stood in front of her car, yelling obscenities and verbal threats as she attempted to pull away. Additionally, there was testimony presented that Defendant/Appellant struck Plaintiff/Appellee's car so hard that repairs were needed. Plaintiff/Appellee also presented testimony to the effect that Defendant/Appellant had anger issues, a drinking problem and was physical with other individuals in the past. There was evidence presented to support Plaintiff/Appellee's fear in this matter. It was this Court's impression that Plaintiff/Appellee's fear was real, reasonable and imminent which warrants protection under the PFA Act. The PFA Act is meant to focus on prevention of abuse. *Snyder v. Snyder,* 427 Pa.Super. 494, 629 A.2d 977 (1993). The intent of remedies provided by the PFA Act is to allow persons to reside peaceably and without injury within their own families or residences. *Miller v. Walker,* 445 Pa.Super. 537, 665 A.2d 1252 (1995). This Court's decision was in accordance with the intent of the PFA Act. Trial court opinion, 9/22/05, at 3–4. We concur, and would add that Appellant's verbal chiding, intimidating demeanor (blocking Appellee's vehicular access), threat of retaliation, and striking of Appellee's vehicle to the point of damaging it coalesce to constitute abusive behavior prohibited by 23 Pa.C.S.A. § 6102(a)(2) (Abuse as defined by the Act includes: "(2) placing another in reasonable fear of imminent serious bodily injury[.]"); *Fonner v.*

*Fonner,* 731 A.2d 160 (Pa.Super.1999). As a result, the issuance of the PFA order was proper.

¶ 13 Accordingly, finding none of Appellant's claims to be meritorious, we affirm the issuance of the PFA order.

¶ 14 Order affirmed.