Leonard SCOTT, Appellant

v.

Robin SHAY, Appellee.

Superior Court of Pennsylvania.

Argued Nov. 15, 2006.

Filed June 26, 2007.

William G. Tressler, Bellefonte, for appellant.

Douglas L. Hearn, State College, for appellee.

BEFORE: TODD, BENDER AND COLVILLE *, JJ.

OPINION BY COLVILLE, J.:

¶ 1 This case is an appeal of a protection from abuse (PFA) order against Appellant. He argues: (1) Appellee had no standing to seek a PFA order and (2) there was insufficient evidence to support the order. We reverse.

### Facts

¶ 2 At some point in the 1980s, when Appellee was a child, she was friends with Appellant's son. Appellee's father and Appellant also knew each other. In or around 1989, Appellant was convicted of indecent assault, Appellee being the victim. In the years that followed, Appellee saw Appellant from time to time in grocery stores, a restaurant where she used to work and a department store where she also worked. Sometimes Appellant was with his wife and/or members of his church. Other times he was alone.

¶ 3 In August 2004, Appellant went to Appellee's house. At the PFA hearing Appellee testified that she could not remember everything Appellant said when he came to her home, but he apparently asked where Appellee's father was and inquired about a lawn mower or mower part Appellant had sold to Appellee's father many years earlier. During the conversation, Appellant indicated that his cousin was Appellee's next-door neighbor. The conversation ended when Appellee told Appellant she would have her father and husband call him.

¶ 4 In October 2005, Appellee's church held a gathering as an alternative to Halloween. Several other churches, including Appellant's, were invited to take part. Appellant attended the function, having volunteered to work at the event. The gathering lasted approximately two hours, and there were some two hundred persons, adults and children, in attendance.

¶ 5 Roughly forty-five minutes into the event, Appellee arrived and learned from one of her friends that Appellant was there. Church leaders then told Appellant he had to remain in a limited area for the rest of the evening. They also assigned a church member to stay by Appellant's side. During the night, there was no contact or conversation between Appellant and Appellee, but Appellant apparently looked and smiled at Appellee more than once. At one point, the two were eight to ten feet apart.

¶ 6 Appellee subsequently filed a petition requesting a PFA order against Appellant. The trial court held a hearing and granted the petition. This appeal follows.

### Statutory Construction

¶ 7 Appellant's first issue, standing, involves a question of law—namely, the interpretation of a statute. For this issue, our standard of review is *de novo* and our scope of review is plenary. *McCance v. McCance*, 908 A.2d 905, 908 (Pa.Super.2006). When we undertake statutory interpretation, our object is to ascertain and then effectuate the intention of the Legislature. 1 Pa.C.S.A. § 1921(a). When possible, this Court construes every statute so as to give effect to all of its provisions. *Id.* If the terms of a statute are clear and free of all ambiguity, we will not disregard the letter of the law in favor of pursuing its apparent spirit. *Id.* at (b). However, when the words of a statute are not explicit, this Court must determine what it was that the General Assembly

* Retired Senior Judge assigned to the Superior Court.

intended. *Id.* at (c). We then apply the legislators' intent when interpreting the law in question. *See id.* at (a), (b), (c).

¶ 8 When determining legislative intent, there are a number of factors that may be helpful. *See* 1 Pa.C.S.A. § 1921(c) (listing factors to consider). Among these are the occasion, necessity and circumstances of the enactment of the statute, the mischief to be remedied and the object to be attained thereby. *McCance,* 908 A.2d at 908, 909. Also important are the consequences of our interpretation. *Id.* More specifically, we must consider whether that interpretation furthers the Legislature's purpose. *See id.*

### Protection from Abuse Act

¶ 9 The purpose of the Protection from Abuse Act ("the Act") is to protect victims of domestic violence from the perpetrators of that type of abuse and to prevent domestic violence from occurring. *Fonner v. Fonner,* 731 A.2d 160, 161 (Pa.Super.1999). The intent of the remedies under the Act is to allow persons to reside peaceably and without injury within their families and/or residences. *McCance,* 908 A.2d at 911.

¶ 10 When passing this statute, the Legislature perceived that the criminal law sometimes failed to penetrate the familial setting. *Snyder v. Snyder,* 427 Pa.Super. 494, 629 A.2d 977, 981 (1993). More particularly, police and prosecutors were sometimes reluctant to pursue charges arising from close domestic relationships. *Yankoskie v. Lenker,* 363 Pa.Super. 448, 526 A.2d 429, 433 (1987). In this sense, the Act was designed to remedy perceived inadequacies in the criminal law with respect to the domestic landscape. *Id.* Accordingly, the mischief the Act seeks to remedy is the violence that can sometimes erupt in spousal, parent-child and/or other household or similarly close relationships. *Snyder,* 629 A.2d at 981. The object of the

Act, then, is to forestall domestic abuse. *Id.*

¶ 11 For the Act to apply, the petitioner seeking to invoke it must have standing, which is to say that the petitioner and the intended respondent must be family or household members. *McCance,* 908 A.2d at 908; 23 Pa.C.S.A. §§ 6102(a), 6106(a). Family or household members are defined to be spouses or persons who have been spouses, persons living as spouses or who have lived as spouses, parents and children, other persons related by consanguinity or affinity, current or former sexual or intimate partners, or persons who share biological parenthood. 23 Pa.C.S.A. § 6102(a).

¶ 12 Consistent with § 6102(a), case law applies the Act only to those persons fitting the aforesaid definition. *See McCance,* 908 A.2d at 910 (applying the Act to in-laws interacting with respect to child custody dispute); *Varner v. Holley,* 854 A.2d 520, 522 (Pa.Super.2004) (applying the Act to persons who had a dating relationship); *D.H. v. B.O.,* 734 A.2d 409, 410 (Pa.Super.1999) (applying the Act to paramours); *Miller on Behalf of Walker v. Walker,* 445 Pa.Super. 537, 665 A.2d 1252, 1254 (1995) (applying the Act to parent and children); *Snyder,* 629 A.2d at 978, 981 (applying the Act to husband and wife). In sum, the Act is concerned with persons who have or have had domestic, familial and/or romantic relationships. It is a domestic relations statute, not a statute governing persons without any such relations.

### Analysis—Standing

¶ 13 Appellant argues that Appellee has no standing to seek a PFA order because he and Appellee have never had any domestic relationship. Appellee claims she is entitled to protection under the Act by virtue of the fact that Appellant

sexually assaulted her some years ago. Appellant and Appellee are not now nor have they ever been spouses. They have never lived as spouses. They are not relatives by blood or marriage. They have not dated; they have not been paramours. The only way that Appellant and Appellee could fall within the definition of family or household members is if the phrase "sexual or intimate partners" is interpreted to include an assailant and a victim.

¶ 14 The Act does not define the term "partners," and it is otherwise unclear whether this term includes the victim of a sex crime. Thus, the term "partners" is not free of all ambiguity. Accordingly, we must interpret the term in light of the legislators' intent. As we have already made clear, their intent was to prevent domestic violence and to promote peace and safety within domestic, familial and/or romantic relationships.

¶ 15 There is certainly no domestic, familial or romantic relationship created between an assailant and a victim of a sex assault. By contrast, the persons who undoubtedly fit the Act's definition of family or household members—*e.g.*, spouses, parents, children, relatives, paramours, and persons who undertake romantic relationships—typically share some significant degree of domestic, familial and/or intimate interdependence. There is often an obvious emotional bond. Frequently, these individuals interface in very practical areas of private life—a mutual residence, common family obligations and/or shared involvement in the affairs of day-to-day living. Even in a dating relationship, where the functional interdependence might not be as substantial as in a family, the participants have elected some measure of personal interaction. This interaction often involves emotional or private concerns not unlike those found in family settings, albeit not normally as extensive or as intense.

In sum, the persons protected by the Act as family or household members have a connection rooted in blood, marriage, family-standing, or a chosen romantic relationship.

¶ 16 There simply is no such connection created by an assault. Surely, a victim would not claim to have had a relationship with the attacker based solely on a sex crime. An assailant and a victim do not, by virtue a crime, suddenly have a bond regarding the private matters of life. They have no interface concerning personal issues and concerns. There is nothing at all about a sex crime that creates a domestic or familial link. We thus hold that a criminal assault does not establish a sexual or intimate partnership for the purposes of the Protection from Abuse Act. Rather, sexual or intimate partners are persons who have mutually agreed to enter such relationships.

¶ 17 It is critical to understand that the flaw in Appellee's argument is her contention that a sex assault creates a family or household relationship. To be sure, if individuals already are family or household members, a sex assault would constitute the type of abuse the Act seeks to prevent. *See* 23 Pa.C.S.A. § 6102(a)(1). However, a sex assault does not **establish** a family or household relationship, thus subjecting the parties to domestic relations law.

¶ 18 We must not lose sight of the fact that the Act was passed because the criminal law was sometimes an inadequate mechanism for dealing with violence that arose in the intimate environs of domestic life. Applying the Act to Appellant would not protect a victim of domestic violence because Appellee was not the victim of domestic violence. Also, since there has been no domestic abuse, a PFA order would not prevent domestic abuse from recurring. Similarly, subjecting Appellant to a PFA order would in no way help to

cultivate peace or safety in a household troubled by familial violence because the parties to this case do not and did not share a household or similar interaction. It is not within our authority to expand the Act beyond the arena in which it was intended to operate.

¶ 19 Moreover, we consider the consequences of our interpretation. By construing "partners" to mean those persons who mutually choose to enter relationships, we give effect to the provisions of the statute in a way that promotes its purpose of preventing violence among people with a domestic, familial or romantic bond, past or present. More simply, our interpretation means that persons who choose to have intimate or sexual relationships are within the purview of domestic relations law. By contrast, to interpret the Act as Appellee would have us do would mean that domestic protective orders could be granted for persons who have no personal relationship of any type. We cannot extend the domestic relations statutes so as to encompass persons who stand in the positions of Appellant and Appellee.

¶ 20 Also relevant is the fact that the criminal law already affords protection from harassment, stalking, assault and a multitude of other crimes. The Legislature has not determined that the criminal law is inadequate to deal with interactions between an assailant and a victim who are not in a family setting. There is no suggestion that police or prosecutors would be unable or unwilling to enforce the criminal law between Appellant and Appellee if the facts warranted its application.

¶ 21 This discussion in no way suggests that Appellant did engage in criminal behavior during the conduct about which Appellee complained in her PFA petition. However, when there is a crime, the criminal law is, in the judgment of the Legislature, sufficient recourse for non-domestic cases.

¶ 22 This observation leads us to comment on a particular aspect of Appellee's brief. The brief argues that, absent application of the Act, Appellee has "... little or no other recourse under the law to prevent [Appellant's] current behavior." Appellant's Brief at 10. By claiming that domestic relations law is essentially the only recourse, Appellee is necessarily suggesting that criminal law does not apply to Appellant's conduct. Despite her implication that Appellant's behavior is not criminal, Appellee believes Appellant should nonetheless be subject to some sanction. Appellant's conduct does not become subject to sanctions under domestic relations law solely because he was convicted under the criminal code at an earlier time. The Act is not intended to punish past criminal conduct. *Snyder*, 629 A.2d at 981. Because of the criminal charges against Appellant, he was subject to prosecution and punishment, and he now bears the life-long stigma of his conviction. It is inappropriate to suggest that, because someone was convicted of a crime, he or she is now and will always be subject to whatever restriction or sanction one might conceive. Such sanctions are left to the Legislature. The Legislature has passed criminal statutes dealing with crimes and domestic statutes dealing with domestic relations. The two areas of law may overlap, but a given fact pattern fits within the domestic relations statutes only if the persons involved in that situation are those contemplated by the statute.

¶ 23 Finally, we understand the emotional appeal to granting crime victims standing in a situation such as the present one. However, it is not our place to enforce domestic statutes against persons solely because they were once convicted of crimes.

¶ 24 Based on the foregoing analysis, we hold that Appellee lacked standing to pursue a PFA order against Appellant. It was, therefore, legal error for the trial court to issue the order in question.

### Analysis—Sufficiency

[2, 3] ¶ 25 Although Appellee did not have standing, there was insufficient evidence to support the PFA order. When considering a claim that the evidence was insufficient to support a PFA order, this Court views the evidence and all reasonable inferences therefrom in the light most favorable to the petitioner. *Walker,* 665 A.2d at 1255. Proceeding in this fashion, we determine if the record contains sufficient evidence to prove abuse by a preponderance of the evidence. *Karch v. Karch,* 885 A.2d 535, 537 (Pa.Super.2005).

¶ 26 Under the Act, abuse is defined as follows:

### § 6102. Definitions

\* \* \* \* \* \* \*

(1) Attempting to cause or intentionally, knowingly or recklessly causing bodily injury, serious bodily injury, rape, involuntary deviate sexual intercourse, sexual assault, statutory sexual assault, aggravated indecent assault, indecent assault or incest with or without a deadly weapon.

(2) Placing another in reasonable fear of imminent serious bodily injury.

(3) The infliction of false imprisonment pursuant to 18 Pa.C.S. § 2903 (relating to false imprisonment).

(4) Physically or sexually abusing minor children, including such terms as defined in Chapter 63 (relating to child protective services).

(5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecutions commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S.A. § 6102(a).

¶ 27 There is no evidence whatsoever that would support a claim under Subparagraphs 1 through 4 of the foregoing definition. Therefore, the only question is whether Appellant's actions would violate Subparagraph 5.

¶ 28 For there to be a violation of Subparagraph 5, there must be a course of conduct. The term "course of conduct" is not defined by Chapter 61 (Protection from Abuse) of Title 23 of the Pennsylvania statutes. However, 23 Pa.C.S.A. § 6102(b) indicates that terms not otherwise defined by Chapter 61 shall have the meaning given to them by Title 18. Title 18 defines "course of conduct" as "[a] pattern of actions composed of more than one act over a period of time, however short, evidencing a continuity of conduct...." 18 Pa.C.S.A. § 2709(f) (harassment); *see also* 18 Pa.C.S.A. § 2709.1(f) (stalking).

¶ 29 After the 2004 conversation at her home, more than a year passed before Appellee saw Appellant. Even then, the event at which she saw him was a well-attended public affair to which his church was invited and at which Appellant and Appellee had no contact. Two encounters that *occur more than a year apart under dissimilar circumstances* and that do not resemble each other can hardly be called a pattern evidencing a continuity of conduct. *Compare R.G. v. T.D.,* 448 Pa.Super. 525, 672 A.2d 341, 342 (1996) (finding course of conduct where the appellant repeatedly initiated unwanted phone calls and e-mail messages to the appellee, told the appellee

she was the object of his obsessive-compulsive disorder, and persisted in continuing to speak with the appellee despite her pleas for him to desist).

¶ 30 We recognize that Appellee also saw Appellant at her work place in the past, but the last such incident took place in 1995. She likewise saw him in grocery stores over the years. However, the record does not support a finding of any connection between those past events and the recent encounters. Because Appellant's alleged behavior did not constitute a course of conduct, there could be no violation of the statute.

¶ 31 Subparagraph 5 also requires that the petitioner have a reasonable fear of bodily injury. Bodily injury is not defined in the Protection from Abuse chapter of Title 23. We therefore look to Title 18. There, bodily injury is defined to be impairment of physical condition or substantial pain. 18 Pa.C.S.A. § 2301. None of the encounters listed in Appellee's PFA petition involved any threat or suggestion that Appellant might inflict on Appellee any such physical pain or impairment of a physical condition. The record simply does not support a reasonable fear of bodily injury. Thus, although Appellee did not have standing under the Act, additionally, there was insufficient evidence to support the order.

¶ 32 Based on the foregoing analysis, we reverse the protection from abuse order.

¶ 33 Order reversed. Jurisdiction relinquished.

¶ 34 Judge TODD files a Concurring Statement.

CONCURRING STATEMENT BY TODD, J.:

¶ 1 I concur in the result. I agree completely with the thoughtful analysis set forth by my learned colleague with respect to the issue of standing. However, as I do not believe it is necessary to proceed with an analysis of the sufficiency of the evidence, I cannot join in that part of the majority's opinion. I therefore concur in the result.