Christine M. EVANS, Appellee

v.

Gordon P. BRAUN, Appellant.

Superior Court of Pennsylvania.

Submitted June 28, 2010.
Filed Dec. 14, 2010.

Frank C. Sluzis, Harrisburg, for appellant.

Rebecca S. Dempsey, Chambersburg, for appellee.

BEFORE: BENDER, SHOGAN and CLELAND,* JJ.

OPINION BY BENDER, J.:

Appellant, Gordon P. Braun, appeals from the January 21, 2010 order granting Appellee, Christine M. Evans, a final protection from abuse (PFA) order against him. Braun argues that the trial court erred in finding that Evans had standing to seek such an order under the Protection from Abuse Act (PFA Act), 23 Pa.C.S. §§ 6101–6122. We affirm.

The court set forth the facts of this case as follows:

[Evans and Braun] work together for a community health care provider. After meeting at work, the two began a stormy dating relationship during the summer of 2009. After an agreeable date, however, [Braun] came to [Evans'] home uninvited, causing her to become upset and ask him for space. The two later reconciled at some point prior to December, 2009. Both parties agree that on December 5, 2009, [Evans and Braun] attended a play in Harrisburg, Pennsylvania. On the way to the performance, [Braun] informed [Evans] he was carrying a gun. Later, when the two returned to his home, [Braun] removed the gun from his waistband, handed it to [Evans], remarked on its weight and told her it could put a very big hole in her. [Evans] testified that she did not know whether [Braun] was attempting to impress her or intimidate her with the statement, and kept her concerns to herself.

On December 17, 2009, the parties were in the midst of a quarrel. [Evans], attending a Christmas party organized by women who were friendly to one another at work, asked [Braun] to come over to the restaurant-bar, Dilly's, to make amends. When [Braun] arrived, [Evans] was standing outside smoking a cigarette with a particularly close friend [named Tammy Harnish]. [Ms. Harnish] went inside, knowing the two were fighting and wishing to allow them to speak freely. After [Braun] became increasingly short tempered, sarcastic, and aggressive, [Evans] turned to go back into the establishment. [Braun] called her name, and [Evans] halted and turned around to look at him. [Braun] then proceeded to pull back his jacket and expose his Colt forty-five semi-automatic pistol, held in his waistband. He told [Evans] to remember he still had the gun, and he was not afraid to use it. [Evans] fled inside, feeling threatened, intimidated, and scared of [Braun], given his previous comments regarding the gun. [Evans] testified that [Braun] has a harsh temper, and she was afraid of him. Although she told the table of

---

* Retired Senior Judge assigned to the Superior Court.

women only that the two had fought, [Evans] reported the entire incident confidentially to [Ms. Harnish] soon thereafter that same evening, becoming hysterical upon relaying [Braun's] threatening behavior with the pistol. The next day, [Evans] reported the incident to her employer, impelled by fear due to their shared workplace. An employee assistance counselor advised her to inform the police, who in turn referred her to the office of Women in Need (WIN). The office responded by scheduling her for the next available appointment. After the appointment, WIN filed a [PFA] action on [Evans'] behalf, with a temporary order of protection issued *ex parte* the same date, Friday, January 8, 2010. Hearing was set for January 14, 2010, but was continued by [o]rder dated January 12, 2010, at the request of [Braun]. Hearing was held Thursday, January 21, 2010.

Following [Evans'] case in chief, [Braun] moved for a directed verdict. The [c]ourt denied the motion, and [Braun] presented his case. Following the conclusion of argument by counsel, the [c]ourt issued a Final [PFA] [o]rder. As did the temporary order, the final [o]rder required that [Braun] surrender his handgun as well as other firearms kept in his home.

Trial Court Opinion (T.C.O.), 3/25/10, at 2–3.

Braun filed a timely notice of appeal, as well as a timely concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). Herein, he raises two issues for our review:

(1) Did the trial court commit an error of law in denying Mr. Braun's Motion for a Directed Verdict based on lack of standing made at the conclusion of Ms. Evans's case-in-chief because Ms. Evans had failed to present any evidence sufficient to support the contention that she is part of the protected class entitled to seek a [PFA] order as defined under the term "abuse" in 23 Pa. C.S. § 6102?

(2) Did the trial court commit an error of law in granting Ms. Evans's Petition for Protection from Abuse despite the fact that Ms. Evans failed to demonstrate that she is a member of the protected class as defined under the term "abuse" in 23 Pa.C.S. § 6102 as eligible to receive a [PFA] [o]rder?

Appellant's Brief at 7.

First, Braun argues that Evans failed to establish her standing under the PFA Act and, thus, the court erred in denying his motion for a directed verdict after Evans' case-in-chief.

In reviewing a trial court's decision whether or not to grant judgment in favor of one of the parties, we must consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner. Our standard[s] of review when considering motions for a directed verdict and judgment notwithstanding the verdict are identical. We will reverse a trial court's grant or denial of a judgment notwithstanding the verdict only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court.

There are two bases upon which a judgment N.O.V. can be entered; one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the

record and concludes that, even with all factual inferences decided adverse to the movant, the law nonetheless requires a verdict in his favor. Whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Campisi v. Acme Markets, Inc.* 915 A.2d 117, 119 (Pa.Super.2006) (citations omitted). Here, Braun avers that he was entitled to judgment as a matter of law because, even taking Evans' allegations as true, her evidence failed to establish that she had standing to obtain relief under the PFA Act. Braun correctly notes that an issue involving standing under a statute is a question of law as it involves the interpretation of that statute. *Scott v. Shay,* 928 A.2d 312, 313 (Pa.Super.2007). Thus, our standard of review is de novo and our scope of review is plenary. *Id.* (citation omitted).

With these standards of review in mind, we must begin by analyzing whether the evidence presented by Evans was sufficient to prove that she is a member of the class of people that the PFA Act seeks to protect. The statute directs that an adult may seek relief "by filing a petition with the court alleging abuse by the defendant." 23 Pa.C.S. § 6106(a). "Abuse," as defined in the Act, includes, *inter alia:*

The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:

(1) Attempting to cause or intentionally, knowingly or recklessly causing bodily injury, serious bodily injury, rape, involuntary deviate sexual intercourse, sexual assault, statutory sexual assault, aggravated indecent assault, indecent assault or incest with or without a deadly weapon.

(2) Placing another in reasonable fear of imminent serious bodily injury.

23 Pa.C.S. § 6102(a)(1)-(2). In *Scott,* we explained that "[f]or the Act to apply, the petitioner seeking to invoke it must have standing, which is to say that the petitioner and the intended respondent must be a family or household member." *Scott,* 928 A.2d 312. Applicable to the instant case is the fact that "family or household member" is defined as including "current or former sexual or intimate partners." 23 Pa.C.S. § 6102(a).

Instantly, Evans sought relief under the PFA Act alleging that she and Braun were "sexual or intimate partners." While the PFA Act does not specifically define that phrase, we examined the meaning of this language in *Scott.* We began by analyzing the intent of the legislators in enacting the PFA Act, stating:

As we have already made clear, their intent was to prevent domestic violence and to promote peace and safety within domestic, familial and/or romantic relationships.

... [T]he persons who undoubtedly fit the Act's definition of family or household members—*e.g.,* spouses, parents, children, relatives, paramours, and persons who undertake romantic relationships-typically share some significant degree of domestic, familial and/or intimate interdependence. There is often an obvious emotional bond. Frequently, these individuals interface in very practical areas of private life—a mutual residence, common family obligations and/or shared involvement in the affairs of day-to-day living. Even in a dating relationship, where the functional interdependence might not be as substantial as in a family, the participants have elected some measure of personal interaction. This interaction often involves emotional or private concerns not unlike those

found in family settings, albeit not normally as extensive or as intense. In sum, the persons protected by the Act as family or household members have a connection rooted in blood, marriage, family-standing, or a chosen romantic relationship.

*Scott,* 928 A.2d at 315. With this rationale in mind, we construed the word "partners" "to mean those persons who mutually chose to enter relationships." *Id.* at 316. This interpretation, we concluded, "give[s] effect to the provisions of the statute in a way that promotes its purpose of preventing violence among people with a domestic, familial or romantic bond, past or present." *Id.*

Applying our reasoning in *Scott* instantly, we conclude that Evans presented sufficient evidence to prove that she and Braun "mutually chose" to enter a "dating relationship" which involved a "romantic bond," albeit short-lived. *See id.* at 315–16. Evans testified at the final PFA hearing that she and Braun "dated twice." N.T. PFA Hearing, 1/21/10, at 5. She stated that after going to a play on their second date, Braun drove her back to his house because he wanted her to meet his son. *Id.* at 8. On the night that Braun threatened her with a gun at Dilly's, Evans stated that she invited him to the bar-restaurant to apologize. *Id.* at 12. She explained why she was apologizing, stating:

> [I was apologizing] [b]ecause I had been very straightforward with him, said some things that he might have interpreted to be unkind. I lost my husband a year and a half ago. I've been going very slow, trying to go very slow in relationships. And he's very pushy and wanted things that I was not ready for.

*Id.* at 12. After Evans testified, she called Ms. Harnish to the stand. Ms. Harnish claimed that on the night Braun threatened Evans at Dilly's, Evans confided in Ms. Harnish about Braun. *See id.* at 24–26. During this conversation, Evans told Ms. Harnish that Braun had told her that he loved her. *Id.* at 26.

Based on this testimony, we conclude that there was sufficient evidence presented that Braun and Evans mutually chose to enter a dating relationship which, pursuant to *Scott,* qualifies as a "sexual or intimate partnership" under the PFA Act. As noted in *Scott,* dating relationships such as this may not have a "functional interdependence ... as substantial as in a family" but, nonetheless, Evans and Braun "elected some measure of personal interaction."[1] *See Scott,* 928 A.2d at 315.

Furthermore, we note that our conclusion is supported by the fact that "the Act was passed because the criminal law was sometimes an inadequate mechanism for

---

1. While we do not rely on it, we note that Braun's own testimony bolsters our conclusion that he and Evans were involved in a "sexual or intimate partnership" as defined in *Scott.* For instance, Braun stated that he and Evans had "dated several times." *Id.* at 61. They first went on a date in the summer of 2009 when Braun went to Evans' house to watch a movie and get Chinese food. *Id.* He testified that "things got a little close" on that date and, as such, he mistakenly believed that it was acceptable to stop by Evans' house unannounced several days later. *Id.* at 62. However, when Braun stopped by, Evans became upset. *Id.* Braun stated that at that point, he "broke it off" with Evans. *Id.* Nevertheless, in December of 2009, Braun asked Evans to go on a second date and the two went to a movie. *Id.* at 63. Braun explained that Evans was "very touchy feely" during the movie. *Id.* He testified that he and Evans went out a third time to see a play in Harrisburg. *Id.* On another occasion, Braun went to Evans' house because she was upset. *Id.* at 68. Braun sat with Evans and they talked about Braun's prior marriage and divorce. *Id.* at 68–69.

dealing with violence that arose in the intimate environs of domestic life." *Scott*, 928 A.2d at 315. In this case, criminal law proved to be an ineffective avenue for Evans to seek protection from Braun. Despite the fact that Braun twice showed Evans a gun and made threatening comments like "he could put a very big hole in her," and "he still had the gun, and was not afraid to use it," the police did not pursue a criminal investigation or charges against Braun. *See* T.C.O. 2–3. Instead, they directed Evans to WIN. Arguably, this is precisely the type of scenario that the Legislature intended the PFA Act to address, which bolsters our conclusion that Evans had standing to seek protection under that statute.

In sum, therefore, the trial court did not commit an error of law in concluding that Evans qualified as a member of the class of people protected by the PFA Act. Accordingly, the court did not err in denying Braun's motion for a directed verdict, nor in granting Evans a final PFA order against Braun.

Order affirmed.

Judge CLELAND files a dissenting statement.

### DISSENTING STATEMENT BY CLELAND, J.:

I respectfully note my dissent from the majority's expansive view of the Legislature's intent in enacting the Protection from Abuse Act and concluding Evans had standing to bring this action.

Evans' testimony established that she and Braun were co-workers who had gone on two dates. She did not testify they were particularly intimate, either sexually or emotionally.[1] Under the facts of this case, I do not agree Evans and Braun can be considered "current or former sexual or intimate partners" as that term is used either in the statute or discussed in our caselaw. Their relationship simply did not entail the "significant degree of domestic, familial and/or intimate interdependence" the Act is intended to address. *Scott*, 928 A.2d at 315.

The majority further concludes the "criminal law proved to be an ineffective avenue for Evans to seek protection from Braun" and, therefore, "bolsters our conclusion that Evans had standing to seek protection under the statute." Majority Opinion at 400.

However, arguably it was not the criminal law that proved to be ineffective. The criminal law "already affords protection from harassment, stalking, assault and a multitude of other crimes." *Scott*, 928 A.2d at 316. If the police failed to recognize the possibility Evans was the victim of criminal acts and afford her the protection of the Crimes Code, their failure does not bolster her into an "intimate partner" as defined by the Legislature in the Protection from Abuse Act.

As we noted in *Scott*, "the Act is concerned with persons who have or have had domestic, familial and/or romantic relationships. It is a domestic relations statute, not a statute governing persons without any such relations." *Id.* at 314. I do not believe the Legislature, given its stated intent, intended to authorize a trial court to grant the expansive relief provided in the Act based on a two-date relationship. That is the realm of the criminal law.

Therefore, I respectfully dissent.

---

1. While Braun's testimony, cited by the majority in footnote 1 is arguably to the contrary, the trial court did not find his testimony credible. T.C.O. at 10.