J-S27001-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ANTHONY MARK WHITE | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL URBAN | : | |
| | : | |
| Appellant | : | No. 394 EDA 2022 |

Appeal from the Order Entered December 29, 2021
In the Court of Common Pleas of Bucks County
Civil Division at No:  2021-61552

BEFORE:  STABILE, J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY STABILE, J.:              **FILED NOVEMBER 22, 2022**

Appellant, Michael Urban ("Michael"), appeals from the December 29, 2021 order entered in the Court of Common Pleas of Bucks County, prohibiting Michael from having any contact with Appellee, Anthony Mark White ("Anthony").  Michael argues that the trial court erred as a matter of law when it determined that Anthony had standing to file a petition against Michael under the Protection from Abuse ("PFA") Act, 23 Pa.C.S.A. § 6101, *et seq.*  We agree with Michael that Anthony lacks standing because Michael and Anthony are not "family or household members" as defined in Section 6102 of the Act. Because the trial court erred when it found standing, we vacate the December 29, 2021 order.

The trial court summarized the procedural history of this case in its Rule 1925(a) opinion, explaining that Anthony filed a petition on August 30, 2021,

seeking a PFA order against Michael. A temporary order was entered in response. Michael filed a motion for reconsideration. The temporary order was extended until December 29, 2021, when the court conducted a hearing. At the conclusion of the hearing, the court denied Michael's reconsideration motion and entered a final order granting Anthony's PFA petition for a period of three-years.[1] This timely appeal followed. Both Michael and the trial court complied with Pa.R.A.P. 1925.

Michael asks us to consider one issue in this appeal:

> Whether the trial court erred as a matter of law in finding that [Anthony] had standing to file a petition under the [PFA] Act, 23 Pa.C.S.A. § 6101, *et seq*. as [Michael] and [Anthony] are not "family or household members, sexual or intimate partners, or persons who share biological parenthood." 23 Pa.C.S.A. § 6102.

Michael's Brief at 4.

Initially, we note that our standard of review "regarding an issue of standing under the [PFA] Act is *de novo* and our scope of review is plenary." **B.R.S. v. J.L.**, 236 A.3d 1167, 1168 (Pa. Super. 2020) (citing **McCance v. McCance**, 908 A.2d. 905, 908 (Pa. Super. 2006)). In **B.R.S.**, this Court explained that

> [t]he goal of the PFA Act is protection and prevention of further abuse by removing the perpetrator of the abuse from the

---

[1] Relevant provisions of the order direct Michael not to "abuse, harass, stalk, or threaten or attempt to use physical force" that would be expected to cause bodily injury to Anthony or any other protected person. Order at ¶ 1. Further, Michael is prohibited from stalking or harassing Traci Urban ("Traci"), who is identified in the order as Anthony's "Girlfriend." *Id.* at ¶ 3. As will be discussed herein, Traci is also Michael's estranged wife.

household and/or from the victim for a period of time. As for individuals who may seek refuge within the confines of the Act, the statute's protective sphere encompasses "family or household members." In section 6102 of the Act, the term "family or household members" is defined as,

> Spouses or persons who have been spouses, persons living as spouses, parents and children, other persons related by consanguinity or affinity, current or former sexual or intimate partners or persons who share biological parenthood.

*Id.* at 1168-69 (cleaned up) (quoting **McCance**, 908 A.2d at 908).

The trial court summarized the testimony presented at the December 29, 2021 hearing as follows:[2]

> During the hearing, Michael testified that Anthony is dating [Michael's] wife Traci. [Michael] explained that he, from day one, has had an "open" relationship with Traci. He was aware that she was having sex with other men, including Anthony. The petition for protection against abuse order filed by Anthony checked off the box listing Michael as a "current or former sexual or intimate partner with Anthony." To dispute this, Michael testified that he is not currently having a sexual relationship with Anthony and has not had an intimate relationship with him. Michael stated that he has never been in the same room as Anthony other than when he first saw him in the Prothonotary's Office on January 6, 2021, while Michael was filing a PFA against Traci and Traci was, at the same time, filing a PFA against Michael.
>
> Traci testified that Anthony is now her live-in boyfriend. Michael is her soon-to-be ex-husband and they had been legally separated for about one year at the time of the hearing. She met Anthony at the pool room where she worked. She had known him for four years and has been romantically involved with him almost two years.

---

[2] While the trial court referred to the involved individuals by their full names, including their respective roles in this appeal, we have taken the liberty of referring to them by their first names, *i.e.*, Michael, Anthony, and Traci.

Traci explained that one of Michael's sexual fetishes was to "watch Traci be with other men and watch, listen, and participate on occasion." Because of this, when Traci discovered that Anthony was interested in her, she told Michael. Michael approved, requested, and encouraged Traci to have a sexual relationship with Anthony so he could listen to them have sex. In fact, Michael wanted to meet Anthony, and later introduced himself to Anthony and shook his hand at Traci's New Year's Eve 2019 to 2020 work party. Also, "Traci would be encouraged and asked by Michael to go have sex with Anthony. And then Anthony would ejaculate into her vagina, and she would go home and Michael would orally take it out of her vagina."

Anthony did not originally know that Traci was going to call Michael on the phone and place him on speaker so he could listen to them having sex, but later, did know and consent to it. In addition, Michael and Anthony negotiated for time spent with Traci. Once, while Traci was in bed with Anthony at his house, Michael and Anthony discussed, over the phone, that Anthony could have Traci, but Michael wanted her for Friday nights, "whether it be sexual or dinner or whatever," and insisted that Anthony respect that request.

Traci did not know of any occasion where both men were physically in the same room or house when she was having sex with Anthony.

Traci and Anthony had become closer, started to exclude Michael from their relationship, and Traci told Michael that she wanted to leave him. Traci planned to separate from Michael in December of 2020.

Trial Court Rule 1925(a) Opinion ("TCO"), 5/10/22, at 4-5 (references to notes of testimony omitted).

The court noted that problems arose after Michael was removed from the triangular relationship. "They now menace each other as they (at the same time) seek PFAs against each other." *Id.* at 6 (footnote omitted).

The trial court explained that, after listening to the testimony, the court "found that there was an 'intimate' relationship between [Michael, Anthony, and Traci] because they were all aware of and consented to a triangle sexual and intimate relationship. They openly, verbally shared [Traci] sexually and the time they each spent with her." *Id.* at 6. Quoting *McCance*, the court agreed with Anthony that the PFA Act "is designed to promote peace and tranquility of households, and among family members and intimate partners who reside or have resided together." *Id.* (quoting *McCance*, 908 A.3d at 907). The court also quoted this Court's opinion in *B.R.S.* in which we reiterated that

> the persons who undoubtedly fit the Act's definition of family or household members—*e.g.*, spouses, parents, children, relatives, **paramours, and persons who undertake romantic relationships—typically share some significant degree of domestic, familial and/or intimate interdependence**. There is often an obvious emotional bond. Frequently, these individuals interface in very practical areas of private life—a mutual residence, **common family obligations and/or shared involvement in the affairs of day-to-day living**. . . . In sum, the persons protected by the Act as a family or household members have a connection rooted in blood, marriage, family-standing, **or a chosen romantic relationship**.

*Id.* at 7 (emphasis added by trial court) (quoting *B.R.S.*, 236 A.3d at 1169) (in turn quoting *Scott v. Shay*, 928 A.2d 312, 315 (Pa. Super. 2007)).[3]

---

[3] As discussed *infra*, this Court again quoted the language from *B.R.S.* and *Shay*, as well as the federal law definition of "intimate partners," in *Commonwealth v. Getkin*, 251 A.3d 425 (Pa. Super. 2021). *See* n. 6.

Interpreting the case law, the trial court "affirmed that the parties in this case had a prior intimate relationship and/or affinity to one another encircling romantic and family matters[.]" *Id.* The court repeated its statement made at the conclusion of the December 29, 2021 hearing, noting:

> [T]he facts that have been established—and they include that there was a permission given by Michael for his wife and Anthony to be engaged in sexual relationships and that there was participation on the part of Michael even though it was on a segmented and from a temporal standpoint—it was segmented in time. But in terms of transactions and the relationship matter was one that was a continuing single episode [*sic*].
>
> As a result, there were sexual relationships as I find the testimony of Traci as being credible. And, frankly, there was confirmation of that credible testimony of wife by Michael when he admitted that he gave permission for that sexual relationship to take place.
>
> Therefore the relationships were sufficiently intimate for purposes of activating the standing for bringing an action under the PFA Act. And, therefore the court concludes that standing does exist. And Anthony may proceed as a potential protected party under the Act.

*Id.* at 7 (quoting Notes of Testimony, 12/29/21, at 46-47).[4]

As noted at the outset, our standard of review regarding the issue of standing under the PFA Act is *de novo* and our scope of review is plenary. *B.R.S.*, 236 A.3d at 1168. To qualify for protection under the PFA Act, Anthony must demonstrate that he is "family or household member" under

---

[4] Again, we have taken the liberty of using the first names of the individuals involved. We note that after the court decided the issue of standing, the hearing proceeded in order to determine whether the PFA should be granted.

23 Pa.C.S.A. § 6102, *i.e.*, "[s]pouses or persons who have been spouses, persons living as spouses or who lived as spouses, parents and children, other persons related by consanguinity or affinity, current or former sexual or intimate partners or persons who share biological parenthood." Clearly, Michael and Anthony are not now, nor have they ever been, spouses, persons living as spouses, parents, or children. Nor are they persons related by consanguinity or affinity, or persons who share biological parenthood.[5] Therefore, unless Michael and Anthony are "current or former sexual or intimate partners," as Anthony represented in his PFA petition, Anthony is not entitled to protection under the PFA Act.

The record clearly reflects that Michael and Traci were spouses, and that Anthony and Traci qualify as current sexual or intimate partners. However, the issue here is the relationship between Michael and Anthony, and whether

---

[5] Although the trial court found, or at least suggested, Michael and Anthony were related by affinity, *see* TCO, 5/10/22, at 7, we do not find affinity under the facts here. Michael and Anthony are not "in-laws" or married to each other's in-laws, as was the case in *B.R.S.* In *B.R.S.*, we concluded that the petitioner had standing to seek a PFA order against his wife's sister's husband, because a "person related by . . . affinity" includes all definitions of a brother-in-law or sister-in-law. *Id.*, 236 A.3d at 1169. *See also Commonwealth v. Walsh*, 36 A.3d 613, 618 (Pa. Super. 2012) (explaining that "affinity," while not defined in the PFA Act, is defined in Webster's American Dictionary, 14 (2nd College ed.2000) as, *inter alia*, "related by marriage or by ties other than those of blood," and that affinity existed between victim and appellant because victim's two half-siblings were natural children of appellant and victim's mother).

Michael and Anthony were sexual or intimate partners so as to establish standing under the PFA Act.

As Michael correctly notes, this Court acknowledged in **Scott** that the Act does not define partners. Michael's Brief at 8 (citing **Scott**, 928 A.2d at 315). Because "the term 'partners' is not free of all ambiguity, . . . we must interpret the term in light of the legislators' intent. As we have already made clear, their intent was to prevent domestic violence and to promote peace and safety within domestic, familial and/or romantic relationships." **Scott**, 928 A.2d at 315.[6]

_____

[6] Although in a context different from the case before us, in **Commonwealth v. Getkin**, 251 A.3d 425 (Pa. Super. 2021), this Court discussed firearms disqualifications applicable to persons who commit crimes of domestic violence against an "intimate partner." The Court noted that federal law defines "intimate partner" as, "with respect to a person, the spouse of the person, a former spouse of the person, an individual who is a parent of a child of the person, and an individual who cohabitates or has cohabitated with the person." **Id.** at 430 (quoting 18 U.S.C. § 921(a)(32)). The Court in **Getkin** further noted that while the PFA Act does not define the term, this Court had explored the term as well as legislative intent with respect to the term in **Scott**, and went on to quote the language from **Scott** that this Court adopted in **B.R.S.**, and which the trial court included in its opinion. **Id.**

Other jurisdictions similarly define "intimate partners," including Kansas ("'Intimate partners or household members' means persons who are or have been in a dating relationship, persons who reside together or who have formerly resided together or persons who have had a child in common." K.S.A. § 60-3012(b)); Nebraska (**See State v. Gay**, 18 Neb.App. 163, 166, 778 N.W.2d 494, 497 (2009) ("Section 28–323(7) defines an 'intimate partner' as 'a spouse; a former spouse; persons who have a child in common whether or not they have been married or lived together at any time; and persons who are or were involved in a dating relationship.' Section 28–323(7) goes on to define a 'dating relationship' as 'frequent, intimate

*(Footnote Continued Next Page)*

In this case, Anthony testified that Michael threatened to "fuck him up," and charged at him—in Michael's driveway—with a hockey stick and with a rake on separate occasions. Anthony claimed he felt threatened by Michael's actions and by his reputation for violent tendencies. N.T., 12/29/21, at 52-59. However, as the Court recognized in **Scott**:

> We must not lose sight of the fact that the Act was passed because the criminal law was sometimes an inadequate mechanism for dealing with violence that arose in the intimate environs of domestic life. . . . [S]ubjecting Appellant to a PFA order would in no way help to cultivate peace or safety in a household troubled by familial violence because the parties to this case do not and did not share a household or similar interaction. It is not within our authority to expand the Act beyond the arena in which it was intended to operate.
>
> . . . By construing "partners" to mean those persons who mutually choose to enter relationships, we give effect to the provisions of the statute in a way that promotes its purpose of preventing

_____

associations primarily characterized by the expectation of affectional or sexual involvement, but does not include a casual relationship or an ordinary association between persons in a business or social context.'"); Washington ("'Intimate partners' means: (a) Spouses or domestic partners; (b) former spouses or former domestic partners; (c) persons who have a child in common regardless of whether they have been married or have lived together at any time; (d) adult persons presently or previously residing together who have or have had a dating relationship; (e) persons 16 years of age or older who are presently residing together or who have resided together in the past and who have or have had a dating relationship; or (f) persons 16 years of age or older with whom a person 16 years of age or older has or has had a dating relationship." Rev. Code. Wash. (ARCW) § 10.99.020(8)). While not binding on us, we find these definitions from our sister states instructive and consistent with the federal law definition employed by this Court in **Getkin**.

violence among people with a domestic, familial or romantic bond, past or present. More simply, our interpretation means that persons who choose to have intimate or sexual relationships are within the purview of domestic relations law.

Also relevant is the fact that the criminal law already affords protection from harassment, stalking, assault and a multitude of other crimes. The Legislature has not determined that the criminal law is inadequate to deal with interactions between an assailant and a victim who are not in a family setting. There is no suggestion that police or prosecutors would be unable or unwilling to enforce the criminal law between Appellant and Appellee if the facts warranted its application.

*Id.*, 928 A.2d at 315-16.

That same sentiment was reiterated in *Evans v. Braun*, 12 A.3d 395 (Pa. Super. 2010), where the Majority determined that a woman had standing to seek a PFA order against a co-worker. In dissent, the Honorable John M. Cleland observed:

Evans' testimony established that she and Braun were co-workers who had gone on two dates. She did not testify they were particularly intimate, either sexually or emotionally. Under the facts of this case, I do not agree Evans and Braun can be considered "current or former sexual or intimate partners" as that term is used either in the statute or discussed in our caselaw. Their relationship simply did not entail the "significant degree of domestic, familial and/or intimate interdependence" the Act is intended to address. *Scott*, 928 A.2d at 315.

The majority further concludes the "criminal law proved to be an ineffective avenue for Evans to seek protection from Braun" and, therefore, "bolsters our conclusion that Evans had standing to seek protection under the statute." Majority Opinion at 400.

However, arguably it was not the criminal law that proved to be ineffective. The criminal law "already affords protection from harassment, stalking, assault and a multitude of other crimes." *Scott*, 923 A.2d at 316. If the police failed to recognize the possibility Evans was the victim of criminal acts and afford her the

protection of the Crimes Code, their failure does not bolster her into an "intimate partner" as defined by the Legislature in the Protection from Abuse Act.

As we noted in **Scott**, "the Act is concerned with persons who have or who have had domestic, familial and/or romantic relationships. It is a domestic relations statute, not a statute governing persons without any such relations." **Id.** at 314. I do not believe the Legislature, given its stated intent, intended to authorize a trial court to grant the expansive relief provided in the Act based on a two-date relationship. That is the realm of the criminal law.

**Evans**, 12 A.3d at 400 (Cleland, J. dissenting).

As in **Scott**, and as discerned by the dissent in **Evans**, the PFA Act is not concerned with persons who do not have "domestic, familial and/or romantic relationships." **Scott**, 923 A.2d at 314. The Crimes Code provides for protection of individuals without such relations. Whereas in **Evans**, the police did not pursue a criminal investigation or charges at Evans' urging, here the testimony reflected that police did respond to calls regarding Michael's actions. **See** N.T., 12/29/21, at 74. And Michael testified that he had contacted the police "close to 20 times" regarding Anthony's behavior. **Id.** at 93. As was the situation in **Scott**, "[t]here is no suggestion that police or prosecutors would be unable or unwilling to enforce the criminal law between Appellant and Appellee if the facts warranted its application." **Scott**, 912 A.2d at 316.

While the relationship between the two men in the instant case has been contentious, Michael and Anthony were not sexual or intimate partners, nor were they in a domestic, familial, or romantic relationship. They were both

involved in a relationship with a third person, Traci. Michael and Anthony were parties to what could be most delicately described as a warped love triangle. If we were to find that Anthony had standing under the PFA Act as a "family or household member," we would be expanding the definition of that term to include any participant in a love triangle, even if there was no family or household relationship between the individuals by whom and against whom the PFA order was being sought. This is not a situation the PFA Act was designed to address. There are criminal statutes available for such purposes. As this Court observed in **Scott**, "The Legislature has passed criminal statutes dealing with crimes and domestic statutes dealing with domestic relations." **Scott**, 928 A.2d at 316.

In his petition, Anthony sought protection against Michael as a "current of former sexual or intimate partner." Because Michael was not Anthony's current or former sexual or intimate partner, and because he did not otherwise qualify as a family or household member, we find the trial court erred by concluding that Anthony had standing under the PFA Act. Therefore, we vacate the December 19, 2021 order.

Order vacated.[7]

Judge Sullivan joins the memorandum.

---

[7] We recognize that the order entered by the trial court also prohibited Michael from stalking or harassing Traci, and that vacating the order erases that prohibition. **See** n.1. However, there is no question that Traci has standing to pursue a PFA against Michael should she elect to do so.

Judge Nichols concurs in the results.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/22/2022