# Harman v. Kennedy

412

*E. David Harr,* for plaintiffs.
*Bernard P. Matthews Jr.,* for defendants.

LOUGHRAN, *J.,* July 10, 1995—Plaintiffs commenced this action to recover damages as a result of alleged negligent care and treatment rendered to the plaintiff, Melba W. Harman, by the defendants, George W. Kennedy, M.D. and Latrobe Area Hospital.

In paragraphs 4-7 of plaintiffs' complaint, plaintiffs allege that on December 29, 1993, Melba W. Harman was treated and evaluated at the Latrobe Area Hospital emergency room by Dr. Kennedy for nasal bleeding complications following nasal septal reconstruction and partial bilateral inferior surgery that was performed earlier that same day by Dr. R.K. Naidu.

Plaintiffs allege that Dr. Naidu was then called to the hospital, and thereafter, Dr. Naidu treated the plaintiff for the nasal bleeding. Plaintiffs allege throughout the complaint and amended complaint that they sustained injuries and damages as a result of the alleged negligent treatment provided by the defendants. In paragraphs 63 through 66 of plaintiffs' amended complaint in civil action, plaintiffs allege that their injuries and damages directly and proximately resulted from the negligence of Latrobe Area Hospital Inc. in violating the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. §1395dd et seq.

Specifically, paragraph 64(a) alleges that Latrobe Area Hospital Inc. was negligent for allegedly violating 42 U.S.C. §1395dd et seq., as follows:

"(a) By failing to provide the plaintiff as an indigent emergency room patient with an appropriate medical screening examination within the capability of the defendant hospital emergency department on December

29, 1993 in violation of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. §1395dd et seq."

The defendants have filed preliminary objections contending that the Court of Common Pleas of Westmoreland County lacks jurisdiction over any claims brought pursuant to the Emergency Medical Treatment and Active Labor Act, as the Act only provides for a federal cause of action and in the alternative, that the plaintiff has failed to allege a cause of action under the Act because of the absence of any allegations that the plaintiff was dumped due to economic reasons.

The Emergency Medical Treatment and Active Labor Act at 42 U.S.C. §1395dd provides not only for a federal cause of action, but also for a state cause of action and this court has concurrent jurisdiction. The Supreme Court of the United States in the case of *Tafflin v. Levitt,* 493 U.S. 455, 107 L.Ed.2d 887, 110 S.Ct. 792 (1990) was faced with the issue of whether state courts have concurrent jurisdiction over civil actions brought under the Racketeer Influenced and Corrupt Organizations Act. The United States Supreme Court began by saying that under our federal system states possess sovereignty concurrent with that of the federal government, subject only to limitations imposed by the supremacy clause. The Supreme Court of the United States has consistently held that state courts have authority to hear claims arising under the laws of the United States. See *e.g., Houston v. Moore,* 5 Wheat. 1, 25-26, 5 L.Ed. 19 (1820); *Claflin v. Houseman,* 93 U.S. 130, 136-37, 23 L.Ed. 883 (1876); *Plaquemines Tropical Fruit Co. v. Henderson,* 170 U.S. 511, 517, 42 L.Ed. 1126, 18 S.Ct. 685 (1898); *Charles Dowd Box Co. v. Courtney,* 368 U.S. 502, 507-508, 7 L.Ed.2d 483, 82 S.Ct. 519 (1962); *Gulf Offshore Co. v. Mobil Oil Corp.,* 453 U.S. 473, 477-78, 69 L.Ed.2d 784, 101

S.Ct. 2870 (1981). The court noted that it had stated in *Claflin,* "If exclusive jurisdiction be neither express nor implied, the state courts have concurrent jurisdiction whenever, by their own constitution, they are competent to take it." (93 U.S. at 136, 23 L.Ed. 833); see also, *Dowd Box, supra* at 507-508, 7 L.Ed.2d 483, 82 S.Ct. 519, "Congress may, if it sees fit, give to the federal courts exclusive jurisdiction."

As the Supreme Court stated in *Gulf, supra,* "the court begins with the presumption that state courts enjoy concurrent jurisdiction. Congress, however, may confine jurisdiction to the federal courts either explicitly or implicitly. Thus, the presumption of concurrent jurisdiction can be rebutted by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state court jurisdiction and federal interests." (453 U.S. at 478, 69 L.Ed.2d 784, 101 S.Ct. 2870.) This means that if the EMTALA does not explicitly state that the state courts do not have jurisdiction and there is compatibility between federal and state law, the state courts have concurrent jurisdiction.

In the instant case, the EMTALA does not explicitly state that the claim under the Act is exclusively federal. The EMTALA under title 42 U.S.C. §1395dd(d)(2) only states that:

"Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in civil action against the participating hospital, obtain those damages available for personal injury under the law of the state in which the hospital is located, and such equitable relief as is appropriate."

Nowhere under 42 U.S.C. §1395(dd) (EMTALA) does it state that a claim must be filed in the federal

court system. It only states that a person that has suffered an injury ("may") file suit to recover damages. It can be assumed that the congressional intent was to be able to seek a remedy for violation of the EMTALA in both the state and federal court systems. If the legislature did not give exclusive jurisdiction to the district courts then the state and federal courts have concurrent jurisdiction, thus giving this court jurisdiction to hear the plaintiffs' case under the EMTALA. Accordingly, defendants' objection as to this issue, under this theory, must be denied.

Whether the plaintiff has presented a claim recognized under EMTALA is the real question that must be decided. 42 U.S.C. §1395dd(a) of the EMTALA provides as follows:

"(a) Medical screening requirement. In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this title [42 U.S.C. §1395 et seq.]) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)) exists."

42 U.S.C. §1395dd(h) further provides as follows:

"(h) No delay in examination or treatment. A participating hospital may not delay provision of an appropriate medical screening examination required under subsection (a) or further medical examination and treatment required under subsection (b) in order to inquire

about the individual's method of payment or insurance status."

Under the Act, if an individual comes to the emergency department and a request is made on behalf of the individual for an examination or treatment for a medical condition, the hospital is required to provide a medical screening examination. 42 U.S.C. §1395dd(a). If it is determined that the individual has an emergency medical condition, the hospital must stabilize the condition or transfer the individual in accordance with subsection (c) of the Act. 42 U.S.C. §1395dd(b).

The enforcement provisions of the Act provide for monetary penalties against both hospitals and physicians. If a hospital knowingly and willfully, or negligently, fails to meet the requirements of the Act, such hospital is subject to termination or suspension of its Medicare provider agreement. 42 U.S.C. §1395dd(d)(1). A participating hospital and its "responsible physicians" are subject to civil monetary penalties to be enforced by the Secretary of Health and Human Services. 42 U.S.C. §1395dd(d)(2).

The Third Circuit has held that it is always appropriate to look to legislative history to help interpret a statute. *Paskel v. Heckler,* 768 F.2d 540, 543 (3rd Cir. 1985). According to the legislative history and subparagraph (h) of the Act, the purpose of this Act is to prevent "patient dumping," which is a term used to describe situations where indigent persons are denied emergency medical care due to the inability to pay for their medical bills. 131 Cong. Rec. at §113903 (daily ed. October 23, 1985).

The United States District Courts have held that where a patient merely is alleging a traditional medical malpractice claim and there is no evidence that the patient was turned away or transferred from a hospital for eco-

nomic reasons, the case falls within the ambit of state negligence law and not the federal anti-dumping law. *Evitt v. University Heights Hospital,* 727 F. Supp. 495 (S.D. Ind. 1989); *Stewart v. Myrick,* 731 F. Supp. 433 (D. Kan. 1990).

In *Evitt, supra,* the plaintiff arrived by ambulance at the emergency department of the hospital complaining of severe chest pain which increased with inspiration and movement. The doctor's provisional diagnosis was costochondritis (inflammation of the chest wall). She was released from the hospital to her home and was told to return to the hospital if her condition worsened. She was considered to be "nonurgent" at the time and was reported in satisfactory condition upon release. *Evitt, supra* at 496.

Evitt returned to the hospital several hours later with increased chest pain and was admitted in critical condition. The doctors determined that she had sustained a recent myocardial infarction, and she was transferred to another hospital for further treatment, including a cardiocatheterizaton and angioplasty. *Id.*

The plaintiff in *Evitt* brought an action against the defendant/hospital alleging that the hospital violated 42 U.S.C. §1395dd(a) during her first visit by not providing for an appropriate screening exam, or in the alternative, that it violated (b) or (c) during her first visit by not stabilizing her condition or properly transferring her to another facility. *Id.*

The *Evitt* court noted the legislative history behind the Act and Congress' intent to combat the growing problem of "patient dumping." *Id.* at 497. The term "patient dumping" refers to the practice of hospital emergency departments, despite being capable of providing needed medical care, transferring patients to other facilities or turning them away because of a patient's

inability to pay for medical treatment due to economic reasons. *Id.* quoting *Reid v. Indianapolis Osteopathic Medical Hospital,* 709 F. Supp. 853, 854 (S.D. Ind. 1989).

While the plaintiff in *Evitt* could pursue her claim in state court under a medical malpractice theory, the district court granted the hospital's motion to dismiss because the patient failed to establish that she was turned away from the hospital for economic reasons. *Id.* at 498. The court held that the plaintiff's interpretation extended beyond the purpose of the statute and her complaint regarding diagnosis and treatment fell within the area of medical malpractice, which is governed by state law. *Id.* "To adjudicate these issues under the anti-dumping provision would lead to federal preemption not contemplated under this Act." *Id.* The court further stated that the statute directs that there will be no preemption, except where the state law directly conflicts with the statute. 42 U.S.C. §1395dd(f). Taking plaintiff's argument to its logical conclusion would lead to the result that any patient dissatisfied with an emergency room diagnosis and release could sue the hospital under the anti-dumping provision. The court held that this was clearly not the intent of the Act. *Id.* Also see, *Stewart v. Myrick, supra.*

A recent decision by the United States Court of Appeals, Fourth Circuit, emphasizes the "anti-dumping" intent of the Emergency Medical Treatment and Active Labor Act. In *In re Baby "K",* 16 F.3d 590 (4th Cir. 1994), the Fourth Circuit discussed at length the purpose and intent behind the Act as follows:

"Congress enacted EMTALA in response to its concern that hospitals were 'dumping' patients (who were) unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their

emergency conditions were stabilized. *Brooks v. Maryland General Hospital Inc.,* 996 F.2d 708, 710 (4th Cir. 1993). Through EMTALA, Congress sought 'to provide an adequate first response to a medical crisis for all patients,' *Baber v. Hospital Corp. of America,* 977 F.2d 872, 880 (4th Cir. 1992) (quoting 131 Cong. Rec. S13904 (daily ed. October 23, 1985) (statement of Senator Dole)); see also, *Brooker v. Desert Hospital Corp.,* 947 F.2d 412, 415 (9th Cir. 1991) (holding that EMTALA applies 'to any and all patients'); *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1040 (D.C. Cir. 1991) (same); *Cleland v. Bronson Health Care Group Inc.,* 917 F.2d 266, 268 (6th Cir. 1990) (same), by imposing two duties on hospitals that have entered into Medicare provider agreements.

"First, those hospitals with an emergency medical department must provide an appropriate medical screening to determine whether an emergency medical condition exists for any individual who comes to the emergency medical department requesting treatment. 42 U.S.C. §1395dd(a). A hospital fulfills this duty if it utilizes identical screening procedures for all patients complaining of the same condition or exhibiting the same symptoms. See *Baber,* 977 F.2d at 879 n.6.

"An additional duty arises if an emergency medical condition is discovered during the screening process. See 42 U.S.C. §1395dd(b). EMTALA defines an 'emergency medical condition' as including:

"a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in

"(i) placing the health of the individual . . . in serious jeopardy,

"(ii) serious impairment to bodily functions, or

"(iii) serious dysfunction of any bodily organ or part. 42 U.S.C. §1395dd(e)(1)(A).

"When an individual is diagnosed as presenting an emergency medical condition the hospital must provide either—

"(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

"(B) for the transfer of the individual to another medical facility in accordance with subsection (c) of this section." *In re Baby "K"*, 16 F.2d at 592-94.

It is clear from the allegations of the plaintiffs' original and amended complaints that plaintiff is attempting to rely upon the language of 42 U.S.C. §1395dd(a) as the *standard of care* required of Latrobe Area Hospital in providing emergency evaluation and treatment to the plaintiff. However, section 1395dd(a) does not establish a "standard of care" applicable to emergency room screening. To the contrary, section 1395dd(a) and (h) provide only that the hospital must provide an "appropriate medical screening examination within the capability of the hospital's emergency department" and without consideration to whether the plaintiff has the ability to pay her bills. The language of section 1395dd(a) does not attempt to define an "appropriate medical screening" and, in fact, recognizes that an appropriate medical screening will vary depending on the capability of the hospital's emergency department. These questions can only be decided on a case-by-case basis under principles of state tort law. In addition, section 1395dd(f) expressly provides that principles of state tort law are not preempted by the Act. See also, *Evitt, supra* at 498.

The only relevance that section 1395dd has to this action relates to whether the plaintiff was denied treatment or transferred to another hospital based on her alleged inability to pay her bills or her lack of insurance. Nowhere in the complaint does plaintiff allege that she was either denied emergency medical care or transferred to another hospital due to her alleged inability to pay or the lack of insurance. Moreover, plaintiffs' complaint does not allege that she was "dumped" in violation of the procedures set forth in the Act and outlined in the case of *In re Baby "K", supra.*

Indeed, plaintiffs' amended complaint alleges that she was *treated* at Latrobe Hospital, albeit in a negligent manner. According to the holdings in *Evitt, Stewart,* and other cases cited *supra,* and the legislative history behind the Act, the plaintiffs, through their original and amended complaints have simply alleged a traditional medical malpractice claim which falls under state negligence law. The plaintiff does not have a proper action under the federal anti-dumping statute.

Accordingly, paragraphs 63 through 66, and Counts VII and VIII of plaintiffs' complaint will be ordered stricken unless, within 20 days, plaintiff files an amended complaint with the necessary allegations to assert a claim under EMTALA.

## ORDER

And now, to wit, July 10, 1995, after review and careful consideration of the within matter, it is hereby ordered, adjudged and decreed that the defendants' preliminary objections for dismissal based upon lack of jurisdiction is hereby denied. Additionally, defendants' objections as to the failure of the plaintiff to allege a claim covered by the Emergency Medical Treatment and Active Labor Act is granted. However, plaintiff

will be granted 20 days to file an amended complaint setting forth a cause of action pursuant to the opinion accompanying this order. In the event the plaintiff fails to file an amended complaint within 20 days, paragraphs 63 through 66 and Counts VII and VIII of plaintiffs' complaint will be stricken on defendants' motion.