Robert A. HOFFA, Individually and t/a Beaux Chevaux Farm, Appellant

v.

RANDY S. BIMES and Quakertown Veterinary Clinic, PC, Appellees.

Superior Court of Pennsylvania.

Argued April 16, 2008.

Filed Aug. 7, 2008.

———————

Robert A. Hoffa, appellant, pro se.

Christine R. Guiliano, Philadelphia, for Bimes, appellee.

BEFORE: STEVENS, KLEIN, and POPOVICH, JJ.

OPINION BY POPOVICH, J.:

¶ 1 Appellant Robert A. Hoffa, individually and t/a Beaux Chevaux Farm, appeals the judgment of compulsory non-suit in favor of Appellees Randy S. Bimes and Quakertown Veterinary Clinic, PC. Appellant claims: 1) the trial court erred in finding that the "Veterinary Good Samaritan Civil Immunity" Act (hereinafter "Veterinary Immunity Act" or the "Act") barred any claims against Appellees save those grounded in gross negligence; 2) the trial court erred in determining that consent was not required in advance of Appellee Dr. Bimes performing a medical procedure upon Appellant's horse; and 3) the trial court erred in concluding that a bailment did not exist absent an allegation of professional negligence in Appellant's complaint. We affirm.

¶ 2 The facts and procedural history of this case are not in dispute and reveal that:

Late in the evening on July 9, 2001, [Appellant's] horse, Cody, [was] presented to [Appellee] Quakertown Veterinary Clinic with symptoms of Colic. [n.1] The horse was brought to the clinic by employees of the training facility caring for the horse at that time. Attempts to contact [Appellant] owner to apprise him of the situation were initially unsuccessful. (N.T., 3/5/07, p. 39–40, 71, 109). After arriving at the clinic, the horse came under the care of Dr. Wilbers, [Appellee Dr. Bimes'] colleague, who began treatment immediately. (N.T., 3/5/07, p. 98). When the horse did not respond to these treatments[,] Dr. Wilbers contacted [Appellee] Dr. Bimes for assistance, informing him that the horse needed further workup and evaluation. (N.T. 3/5/07, p. 99).

When [Appellee] Dr. Bimes arrived at the clinic at 12:15 am on July 10, 2001, he was presented with what [Appellant] and [Appellees] have both stipulated was "an emergency situation." (N.T., 3/6/07, p. 5). Believing that the clinic was unable to get in contact with [Appellant] owner, [Appellee] Dr. Bimes began giving care without consulting [Appellant]. (N.T., 3/5/07, p. 109). In an effort to diagnose the cause of the horse's abdominal pain, [Appellee] Dr. Bimes performed, among other things [n.2], an abdominal tap. This procedure requires that a needle be inserted into the abdominal cavity to extract fluids which can be analyzed to determine the cause of the horse's symptoms. (N.T., 3/5/07, p. 102)[.] It was only after the procedure was completed that [Appellee] Dr. Bimes was able to get into contact with [Appellant]. (N.T., 3/5/07, p. 71). [Appellee] Dr. Bimes does not recall discussing with [Appellant] the various procedures he had undertaken during the course of treatment. (N.T., 3/5/07, p. 110). However, [Appellee] Dr. Bimes and [Appellant] did decide to move the horse to a different facility capable of performing surgery. The horse was taken to the New Bolton Center at around 3:30 am for further treatment.

Unfortunately, it was later discovered that during the course of the abdominal tap the needle pierced the horse's small intestine allowing the leakage of intestinal fluids into the abdominal cavity.

(N.T., 3/6/07, p. 113). This eventually caused an infection to develop which [Appellant] alleges contributed to the death of the horse more than a year later on July 29, 2002.

On June 9, 200[3], [Appellant] initiated this lawsuit against the [Appellees by a writ of summons in trespass, which was followed by a complaint filed June 27, 2005,] wherein he alleged lack of informed consent, a claim for bailment and a claim of trespass to chattel with respect to the treatment rendered to [Appellant's] horse by [Appellee] Dr. Bimes on July 9–10, 2001. At the close of [Appellant's] case, th[e trial c]ourt granted [Appellees'] Motion for Non-suit on each of [Appellant's] claims.

[n.1] Colic is often used to describe a range of gastrointestinal problems in horses. In this particular case, unknown to [Appellee Dr. Bimes], [Appellant's] horse suffered an impaction or blockage of the intestine. (N.T., 3/5/07, p. 43)[.]

[n.2] [Appellee Dr. Bimes] testified that he checked the heart rate, plug return, capillary fill, completed a rectal exam, administered pain meds and did blood work.

Trial court opinion, 11/9/07, at 1–3, n. 1, 2. Thereafter, with the denial of Appellant's motion for post-trial relief and the filing of a notice of appeal, Appellant complied with an order to file a statement of matters complained of on appeal pursuant to Pa. R.A.P. 1925(b), the first of which alleges that the trial court erred in granting a compulsory non-suit in favor of Appellees at the close of Appellant's case-in-chief after finding that the Veterinary Immunity Act bars claims against veterinarians except those based upon gross negligence.

■ ¶ 3 Our standard of review for appeals from the grant or denial of a motion for compulsory non-suit is as follows:

A motion for compulsory non-suit allows a defendant to test the sufficiency of a [plaintiff's] evidence and may be entered only in cases where it is clear that the plaintiff has not established a cause of action; in making this determination, the plaintiff must be given the benefit of all reasonable inferences arising from the evidence. When so viewed, a non-suit is properly entered if the plaintiff has not introduced sufficient evidence to establish the necessary elements to maintain a cause of action; it is the duty of the trial court to make this determination prior to the submission of the case to the jury.

A compulsory non-suit is proper only where the facts and circumstances compel the conclusion that the defendants are not liable upon the cause of action pleaded by the plaintiff.

*Mahan v. Am–Gard, Inc.*, 841 A.2d 1052, 1057–58 (Pa.Super.2003) (*quoting Poleri v. Salkind*, 453 Pa.Super. 159, 683 A.2d 649, 653 (1996) (citations omitted)).

■ ¶ 4 The history of the statutory regulation of the practice of veterinary medicine and surgery in Pennsylvania began with the Act of April 11, 1889, P.L. 28, and was followed by a multitude of laws leading up to the present day Veterinary Immunity Act, which states:

(a) **General rule.**—Any individual licensed to practice veterinary medicine who, in good faith, renders emergency care to an animal which such individual has discovered at the scene of an accident or emergency situation or which has immediately prior to the rendering of such care been brought to such individual's attention at or from the scene of any accident or emergency situation shall not be liable for any civil damages as a result of any acts or omissions by such person in the rendering of the emergency care, except any acts or omissions intentionally designed to harm, or any grossly negligent acts or

omissions which result in harm to the animal.

**(b) Definition.**—As used in this section, "good faith" shall include, but is not limited to, a reasonable opinion that the immediacy of the situation is such that the rendering of care should not be postponed until the animal is hospitalized.

**(c) Exception.**—This section shall not apply where the owner of the animal is in attendance and can be consulted as to the proposed action by the veterinarian.

42 Pa.C.S.A. § 8331.1(a)-(c).

¶ 5 More specifically, the kernel of the dispute between the litigants concerns the meaning of "emergency care" and "emergency situation," neither of which is defined by the Veterinary Immunity Act nor elucidated upon in the historical or statutory notes to the legislation. Consequently, as there is no controlling case law interpreting the aforementioned terms in Section 8331.1(a), we must ascertain the General Assembly's intent with respect to the statute's perceived purpose and the consequences of a particular interpretation. *Krebs v. United Refining Company of Pennsylvania,* 893 A.2d 776 (Pa.Super.2006); *see also Vitac Corp. v. W.C.A.B. (Rozanc),* 578 Pa. 574, 854 A.2d 481 (In ascertaining legislative intent, an appellate court must be guided by the primary purpose of the statute and may consider, among other things, the consequences of a particular interpretation.); *In re Canvass of Absentee Ballots of November 4, 2003 General Election,* 577 Pa. 231, 843 A.2d 1223 (2004) (It is only when the words of a statute are not explicit that a court may resort to other considerations, such as the statute's perceived "purpose," in order to ascertain legislative intent.); *contrast School District of the City of Erie v. Pennsylvania Labor Relations Board,* 832 A.2d 562, 567 (Pa.Cmwlth.2003) ("Where a statute provides internal definitions, the meanings of the terms provided are controlling.").

¶ 6 Furthermore, as our review of the Veterinary Immunity Act is one of law, our standard of review is *de novo,* and our scope of review is plenary. *Sternlicht v. Sternlicht,* 583 Pa. 149, 156, 876 A.2d 904, 908 (2005). When construing a statute, we are guided by the principles set forth in the Statutory Construction Act of 1972, 1 Pa.C.S.A. §§ 1501–1991. *See McCance v. McCance,* 908 A.2d 905, 908 (Pa.Super.2006). Germane to our task are the provisions recited at 1 Pa.C.S.A. § 1921, which provide:

(a) The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions.

(b) When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.

(c) When the words of the statute are not explicit, the intention of the General Assembly may be ascertained, among other matters:

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar objects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

Although "emergency care" and "emergency situation" are not defined in the Veterinary Immunity Act, we may look to other sources for guidance. *See, e.g., McCance,* 908 A.2d at 909 (Black's Law Dictionary and Webster's Third New International Dictionary were relied upon to ascertain meaning of "affinity," which was undefined in the Protection From Abuse Act); *Olshan v. Tenet Health Sys. City Ave., LLC,* 849 A.2d 1214, 1217 (Pa.Super.2004) (where "health care services" not defined in statute, other Pennsylvania statutes could be looked at for meaning).

¶ 7 In *Scaccia v. Old Forge Borough,* 373 Pa. 161, 163–64, 94 A.2d 563, 564 (1953), the Pennsylvania Supreme Court addressed the question of whether an emergency existed that justified the appointment of a special policeman. In the course of doing so, the Court stated:

> It is difficult to define an emergency but as a generalization it is a sudden or unexpected event which creates a temporarily dangerous condition usually necessitating immediate or quick action. *Cf.* 29 C.J.S., Emergency, 760[;] 14 Words and Phrases, Emergency, 435, *et seq.*[;] Webster's New International Dictionary. Ordinary conditions or customarily existent conditions are not emergencies.

*Scaccia,* at 163–64, 94 A.2d at 564. *Cf. Shamnoski v. PG Energy,* 579 Pa. 652, 858 A.2d 589, 599 (2004) (" '[T]he term dam hazard *emergency' [is defined in the Code] in such terms: 'a condition which* the Department, permittee or owner of the dam reasonably finds *constitutes an imminent threat to life or property* [ . . . ].' " (emphasis added)); *In re J.M.,* 556 Pa. 63, 77, 726 A.2d 1041, 1048 (1999) ("[A]s a matter of common sense, an Act designed to respond to emergency, life-threatening situations would have little value if the decision-makers did not have the flexibility to act based upon information which they received [ . . . ]."); *County of Lebanon v. Pa. Labor Relations Bd.,* 873 A.2d 859, 866 (Pa.Cmwlth.2005) ("NFPA 471 defines emergencies as '[a] [ . . . ] condition that poses an immediate threat to the safety to life or damage to property.' "); *Community Life Support Sys. v. Department of Health,* 689 A.2d 1014, 1016 (Pa.Cmwlth.1997) ("The [Pennsylvania] Department [of Health]" is charged with the implementation and enforcement of Act 45. Section 3 of Act 45, 35 P.S. § 6923, defines "emergency medical services" as follows: "The services utilized in responding to the needs of an individual for immediate medical care in order to prevent loss of life or aggravation of [ . . . ] illness or injury."); *Glade Park E. Home Owners Association v. Pa. Public Utility Commission,* 156 Pa.Cmwlth. 466, 628 A.2d 468, 472 (1993) ("52 Pa.Code § 3.1 defines an 'emergency' as a 'situation which presents clear and present danger to life or property.' "); *Slaughter v. Commonwealth, Department of Public Welfare,* 46 Pa.Cmwlth. 463, 406 A.2d 846, 847 (1979) ("[E]mergency situation under 55 Pa.Code § 289.2, [ . . . ] defines an emergency as '[s]udden unexpected circumstances creating a breakdown of [an] individual [ . . . ] resulting in a need for immediate action to avoid destitution of the individual [ . . . ].' "); *Harman v. Kennedy,* 25 Pa. D. & C.4th 411, 419 (1995) ("[Emergency Medical Treatment and Active Labor Act] defines an 'emergency medical condition' as including: a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in[:] (i) placing the health of the individual [ . . . ] in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part. 42

U.S.C. § 1395dd(e)(1)(A)."); 42 Pa.C.S.A. § 8331.2(f) ("Good Samaritan civil immunity" Act defines "Emergency" as, "[a] situation where an individual is believed to be in cardiac arrest and in need of immediate medical attention to prevent death or serious bodily injury."); Webster's Third New International Dictionary at 741 (1971) (defines "emergency" as, "an unforeseen combination of circumstances or the resulting state that calls for immediate action [...] a: a pressing need [...] b: a sudden bodily alteration such as is likely to require immediate medical attention [...] c: a usually distressing event or condition that can often be anticipated or prepared for but seldom exactly foreseen [...].").

¶ 8 In light of the preceding, we read the Veterinary Immunity Act as legislation designed to respond to emergency, life-threatening situations allowing a decision-maker (veterinary doctor) the flexibility to act based upon information received or garnered upon an examination of the animal to make medically sound decisions regarding treatment.

¶ 9 Therefore, applying the facts to the applicable law, we hold that Appellee Dr. Bimes was confronted with an emergency medical condition necessitating, first, a medical examination, and, second, such treatment as might be required to stabilize the medical condition or for the transfer of the animal to another medical facility should a diagnosis show that care and/or treatment was beyond the doctor's or the facility's capacity to administer on site. Herein, Appellee acted with all deliberate speed and medical acumen to examine the horse and conclude that it needed treatment that could only be provided by a veterinary hospital in another county.[1]

¶ 10 Interestingly, both parties stipulated to the fact that, when Appellee Dr. Bimes arrived at the clinic at the request of a fellow colleague who initially examined the horse without ascertaining its problem, an "emergency situation" existed requiring Appellee Dr. Bimes' attention. N.T. Jury Trial, 3/6/07, at 5. In other words, on July 10, 2001, Appellee Dr. Bimes was presented with "a sudden or unexpected event which created a temporarily dangerous condition necessitating immediate or quick action." *Scaccia, supra.* A surface examination of the horse proved uneventful, but Appellee Dr. Bimes did not dismiss the fact that the horse was in discomfort. To further assess the animal's medical condition, Appellee Dr. Bimes decided to administer a probe into the stomach of the horse to extract a fluid for testing, a procedure acknowledged by Appellant's own expert as a proper and recommended course of action under the circumstances to diagnose the ailment impeding the horse to facilitate a treatment. *See* N.T. Videotaped Deposition of Martin G. Crabo, DVM, 2/15/07, at 35 ("[Appellee's counsel:] Q. And, Doctor, in the course of a diagnostic protocol, am I correct that an abdominal tap, [Appellee] Dr. Bimes in this case, would be one of the

---

1. Appellee Dr. Bimes could not perform surgery on the ailing horse at Appellee Quakertown Veterinary Clinic because of the absence of an attending anesthetist. Therefore, with the consent of Appellant, Appellee Dr. Bimes had the horse transported to the New Bolden Center at the University of Pennsylvania for surgery on July 10, 2001. Appellant, both in his complaint and during his testimony, relates the dates upon which the horse was treated by Appellee Dr. Bimes to be "June 10, 2001" or "July 10, 2001." *See* Appellant's complaint, 6/27/05, at ¶¶ 14, 18; N.T. Jury Trial, 3/5/07, at 98. For the sake of uniformity, we have chosen "July 9 and 10 of 2001" as the dates relevant to the events under scrutiny here. *See* Trial court opinion, 11/9/07, at 1–3. The decision we reach in this case does not turn upon the dates the events occurred, but we point out the temporal discrepancy for edification purposes.

first markers that you would use? [Dr. Crabo:] A. It is certainly a commonly-used procedure in evaluating colicky horses, particularly more seriously colicky horses."); *see also* N.T. Jury Trial, 3/5/07, at 89 (Appellant testified that the abdominal tap "is a protocol that can be used."). Therefore, Appellant will not be heard to complain now that Appellee Dr. Bimes rushed to judgment on what medical protocol ("emergency care" in the form of an abdominal tap) to utilize in achieving that objective given the exigency ("emergency situation") present.

¶ 11 Next, we turn to Appellant's contention that the trial court erred in finding that his consent was not required for Appellee Dr. Bimes to perform an abdominal tap on his horse. In particular, Appellant contends that consent to perform the abdominal tap was necessary and this contention is buttressed by an exception set forth in the Veterinary Immunity Act, which provides that the Act shall not be applicable where the "owner of the animal is in attendance and can be consulted to the proposed action by the veterinarian." 42 Pa.C.S.A. § 8331.1(c). Appellant concedes his absence from the veterinary clinic when his horse was transported there by Dillon Poss, who was present and referred to by Appellant as his "agent."

¶ 12 In point of fact, Mr. Poss was the assistant trainer to Richard Timmons, the latter of whom was hired by Appellant to train his horse to be a "reining horse" (traversing a designed area and awarded points in competition against other horses completing the same course). On July 10, 2001, it was Mr. Timmons' belief that Mr. Poss or his other assistant (Ms. Stewart) would have attempted to contact Appellant about the "emergency situation" confronting the horse. N.T. Jury Trial, 3/5/07, at 40. Absent locating Appellant, Mr. Timmons, as a matter of course, would have "sent the horse off for treatment." *Id.* at 41.

¶ 13 Even if Appellant were not notified of the horse's condition on the 10th of July, 2001, the fact remains that the parties' stipulated that the veterinary care was rendered during an "emergency situation," which, by law, dispenses with the need to secure the informed consent of the horse's owner prior to administering "emergency care," which was the case here. 42 Pa. C.S.A. § 8331.1; *McSorley v. Deger,* 905 A.2d 524 (Pa.Super.2006), *appeal denied,* 591 Pa. 715, 919 A.2d 958 (2007) (informed consent doctrine provides that physician is liable for damages if any informed consent is not obtained, except in situations of emergencies; 40 P.S. § 1303.504). As a result, we hold that the trial court committed no error in concluding that Appellant's consent was not required before Appellee Dr. Bimes performed the abdominal tap.[2]

---

**2.** A subpart to Appellant's Issue No. 2 is the claim that, "The issue of whether consent was required to perform the abdominal tap is a question of fact for the jury to decide." *See* Appellant's brief, at 16; Appellant's "Statement of Matters Complained of on Appeal Pursuant to Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure," 7/6/07, ¶ 3. We disagree.

The interpretation and application of the Veterinary Immunity Act is a question of law to be resolved in the first instance by the trial court and not the jury. *See, e.g., McCance, supra* (ascertaining meaning of "affinity" in the Protection From Abuse Act was question of law for court to decide); *see also Kopko v. Miller,* 586 Pa. 170, 177, 892 A.2d 766 (2006) (issue involving interpretation of statutory language presented question of law); *Cimino v. Valley Family Med.,* 912 A.2d 851 (2006), *appeal denied,* 591 Pa. 731, 921 A.2d 494, 2007 Pa. Lexis 875 (2007) (issue of whether expert's medical license was "restricted" for purposes of statute was fundamentally matter of statutory interpretation, which was question of law). Therefore, because the meaning of the terminology ("emergency care" and "emergency situation") was inextricably in-

¶ 14 The last of Appellant's protestations centers upon the contention that the trial court erred in holding that *Price v. Brown*, 545 Pa. 216, 680 A.2d 1149 (1996), barred his causes of action for bailment and trespass to chattels.

¶ 15 In *Price*, Appellant delivered her English Bulldog to Appellee Dr. Nancy Brown for surgical treatment. Once completed, Appellant returned the following day to inquire about her dog's condition. Finding the dog panting and groggy, Appellant requested a 24–hour monitoring by Appellee's agent. When Appellant returned the next morning, she found the animal dead. Appellant filed a complaint basing liability solely upon a theory of bailment. Preliminary objections in the nature of a demurrer were sustained by the trial court, and Appellant's complaint was dismissed on the basis that breach of a bailment agreement, without more, was insufficient to state a cause of action against a veterinarian for death or injury to an animal entrusted to her care for professional treatment.

¶ 16 The Superior Court reversed the trial court finding that the complaint was sufficient to state a cause of action for breach of a bailment agreement, and whether a bailment existed was a question for the fact-finder to resolve. Our Supreme Court granted *allocatur*, reversed the Superior Court, and reinstated the trial court's order dismissing the complaint. In the course of doing so, the high Court stated:

The [trial] court recognized that a dog is personal property, but stated that "Allegations which might give rise to a bailment are, without more, insufficient to state a cause of action against a veterinarian for death or damage to an animal entrusted to his or her care for veterinary treatment." The [trial] court concluded that in order to recover damages for such loss, the plaintiff must plead and prove that the veterinarian was negligent.

We agree with the trial court that the purpose for which an animal is entrusted to the care of a veterinarian is a material fact that must be considered in determining whether a plaintiff's complaint states a cause of action as a matter of law, and that [Appellant's] complaint failed to state a cause of action for professional negligence.

*Price*, at 224, 680 A.2d at 1153.

¶ 17 Appellant points to the criticism of *Price* in a law review article appearing in the Hastings' Law Journal,[3] as if to imply

---

tertwined with the application of the Veterinary Immunity Act on the issue of consent, it was a subject for the trial court to address initially and not a question of fact for the jury. *McCance, supra.* Moreover, given the fact that Appellant was not available to provide his consent prior to performing the abdominal tap, the Veterinary Immunity Act excuses the veterinarian from obtaining the same, especially in this case where the parties stipulated that the doctor was faced with an "emergency situation." 42 Pa.C.S.A. § 8331.1.

3. Appellant quotes the following excerpt from the article; to-wit:

The doctor-patient relationship is entirely different than the relationship between a veterinarian and an animal or between a veterinarian and the animal's owner. In the veterinarian-animal context, the relationship is not consensual, as it is in a doctor-patient context. The animal is not, and cannot give consent, nor is the relationship recognized by law since the animal itself has no legal status. Since animals are considered property, the legal relationship between the animal and the veterinarian is not different than that of a mechanic and an automobile, or a dry cleaner and a 3 piece suit.

Appellant's brief, at 19 *(quoting* Note: *Bailment and Veterinary Malpractice: Doctrinal Exclusivity, or Not?* 55 Hastings L.J. 1009, 1024 (2004)). The point missed by the law

that we should ignore *Price's* holding that a veterinarian is on the same plain as legal and other medical professions and warrants extending professional negligence concepts to veterinary medicine. *Price,* at 222, 680 A.2d at 1152. As an intermediate appellate court, we do not have the luxury to ignore, overturn, or create exceptions to a decision of the Pennsylvania Supreme Court, which limitations have been brought to this Court's attention by our appellate brethren on numerous occasions. *See, e.g., Commonwealth v. Castillo,* 585 Pa. 395, 888 A.2d 775 (2005) (Supreme Court voiced its disapproval of prior decisions of this intermediate appellate court to the extent that it created exceptions to *Commonwealth v. Lord,* 553 Pa. 415, 719 A.2d 306 (1998), and addressed issues that should have been deemed waived); *Commonwealth v. Jones,* 520 Pa. 385, 554 A.2d 50, 51–52 (1989) ("we take this opportunity to remind our Superior Court colleagues that Superior Court does not have the authority to determine that decisions of this [Pennsylvania Supreme] Court are 'no longer controlling [ . . . ].' "); *Dietrich v. J.I. Case Co.,* 390 Pa.Super. 475, 568 A.2d 1272, 1279 (1990) (Pa.R.C.P. 238 held constitutional, and any further determination in this respect could only emanate from the Supreme Court; "We also mention the reminders in the Supreme Court's pointed statements to this [Superior] Court, expressed in Opinions by that Court, that we may not ignore its decisions (or rules) [ . . . ].").

¶ 18 Consequently, we read *Price* to still be viable and hold fast to the precept that a cause of action for professional negli-

gence must be pleaded and proved to recover damages for a loss (death or injury) occasioned by a veterinarian's treatment. In other words, allegations of a breach of a bailment are insufficient to state a cause of action against a veterinarian who has treated an animal which suffers an injury or does not survive the treatment. *Price,* at 219, 680 A.2d at 1150. The denial of Appellant's bailment argument sounds the death knell to his trespass to chattel claim, whose fatal flaw lies in the fact that no professional negligence was alleged under this claim either.

¶ 19 Accordingly, finding no merit in any of Appellant's claims, we affirm the judgment appealed.

¶ 20 Judgment affirmed.

¶ 21 KLEIN, J., concurs in the result.

---

review article and Appellant is the fact that *Price* equated the practice of veterinary medicine with services provided by the legal and other medical professions because each involved specialized education, knowledge, and skills. This distinguishes the veterinarian from the above-referenced "mechanic" or "dry cleaner," which opens the door for the conclusion that professional negligence concepts also extend to veterinary medicine. *Price,* at 222, 680 A.2d at 1152. Appellant has not provided this Court with any persuasive argument to distinguish *Price* from the case at bar.